IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KUECKER LOGISTICS GROUP, INC., | ) | CASE NO: _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT AND DEMAND FOR JURY** |
| | ) | **TRIAL IN OMAHA, NEBRASKA** |
| GREATER OMAHA PACKING CO., | ) | |
| INC. | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW Plaintiff, Kuecker Logistics Group, Inc., and for its Complaint against

Defendant, states and alleges as follows:

## INTRODUCTION

Kuecker Logistics Group, Inc. seeks a judgment against Greater Omaha Packing Co., Inc.

for breach of contract and to foreclose a valid construction lien filed in Douglas County,

Nebraska, arising from Greater Omaha Packing Co., Inc.'s failure to pay Kuecker Logistics

Group, Inc. $2,972,622.19, plus contractual interest under a contract for installation of a

Warehouse Execution System.

## PARTIES

1.      Plaintiff, Kuecker Logistics Group, Inc. ("Kuecker"), is a corporation organized

under the laws of the State of Missouri, whose principal place of business is 801 W. Markey

Road, Belton, Missouri 64012.

2.      Defendant, Greater Omaha Packing Co., Inc. ("GOP"), is a corporation engaged

in meat production and organized under the laws of the State of Nebraska, whose principal place

of business is 3001 L Street, Omaha, Nebraska 68107-0000.  GOP may be served with process

through its Registered Agent, Mark Theisen, 3001 L Street, P.O. Box 7566, Omaha, Nebraska 68107.

## JURISDICTION AND VENUE

3.      This Court has federal diversity jurisdiction pursuant to 28 U.S.C. § 1332 over this Complaint because there is complete diversity and the matter in controversy exceeds the sum of $75,000.00.

4.      Venue is proper in the District of Nebraska pursuant to 28 U.S.C. § 1391 because it is a judicial district in which Defendant resides; in which a substantial part of the events or omissions giving rise to the claim occurred; and in which a substantial part of the property that is the subject of this action is situated.

## FACTUAL BACKGROUND

5.      Plaintiff Kuecker is an end-to-end supply chain execution and services provider, which includes operational analysis and systems engineering.

6.      One such service provided by Kuecker is the installation and maintenance of equipment and software utilized by shipping warehouses.

7.      Defendant GOP is an owner of real property located in Douglas County, Nebraska (the "Property"), which is legally described as follows:

> Lot 2, Stockyards Business Park Replat 1, an addition to the City of Omaha, as surveyed, platted and recorded in Douglas County, Nebraska.

8.      The Property, among other functions, acts as a shipping warehouse owned and operated by GOP.

A. **The Agreement**

9.      Kuecker and GOP entered into three (3) contracts (collectively the "Agreement") whereby Kuecker agreed to install a Warehouse Execution System ("Execution System"), including software used to utilize the Execution System, at the Property.  The three (3) contracts constituting the Agreement are attached as Exhibits 1, 2, and 3.

10.      Kuecker delivered materials, installed equipment and software, provided maintenance and service, and in all other ways materially performed as provided in the Agreement.

11.      GOP has failed to pay Kuecker a portion of the contracted funds in the amount of $2,972,622.19, which includes the principal balance plus contractual interest through July 31, 2020.  The contractual interest of this amount continues to accrue.

12.      Kuecker has made demand for payment in full of the amounts due under the contract.

13.      GOP has failed and refused to pay in full the amounts due under the contract.

14.      Interest on the amounts owed continues to accrue.  In each contract of the Agreement, the Delayed Payments Clause states:

> Article 17 Delayed Payments:
>
> In the event that Purchaser fails to make due and punctual payments for the equipment and/or Work as provided herein, interest shall accrue on the amount due and unpaid at the rate of one percent (1%) per month for each full calendar month or part thereof during which such amount shall be outstanding, such interest to commence to accrue on the fifteenth (15th) day after such amount is due and payable hereunder. If the interest rate provided herein exceeds the maximum interest rate permitted by law, then the interest payable shall be at such maximum permissible amount.

See Exhibits 1 at p. 27, 2 at p. 20, and 3 at p. 18.

**B. Software Installed in the Management System**

15. The Execution System installed by Kuecker consists of two (2) parts: a Warehouse Control System ("Control System") and a Warehouse Management System ("Management System").

16. A dispute arose as to the performance of the software developed and installed by Kuecker with respect to the Management System. The software was designed to allow GOP to optimize the equipment of the complete Execution System.

17. The software delivered by Kuecker meets the purpose of the design under the Agreement and is capable of optimizing the Execution System as intended.

18. Upon information and belief, GOP claims it encountered problems it attributes to the software installed by Kuecker.

19. GOP's problems with the software delivered and installed by Kuecker are the direct result of GOP's failure to replace its in-house network.

20. Prior to installation of the software, Kuecker informed GOP that the GOP in-house network would need to be replaced for the software to perform as expected.

21. GOP agreed to replace and verify its in-house network.

22. Throughout installation and in subsequent communications, Kuecker repeatedly brought to GOP's attention the issues caused by its in-house network, but GOP failed to make the necessary changes.

23. Upon information and belief, GOP claims that the software installed by Kuecker is defective in that it requires an employee of GOP to enter data to perform its function.

24. The Agreement does not require Kuecker to install or maintain software which would constitute artificial intelligence, neural networks, machine learning, "thinking" computer

systems, or any other software or process which would not require direct input of data from a human being.

## FIRST CAUSE OF ACTION
### Breach of Contract
### Against Defendant Greater Omaha Packing Co., Inc.

25.     Kuecker, for its first cause of action against GOP, incorporates the foregoing paragraphs as if fully set forth herein.

26.     Kuecker and GOP entered into the Agreement through which Kuecker agreed to provide material and perform services at the Property.

27.     Kuecker performed the services and provided the materials for which the parties contracted, and GOP accepted the services and materials.

28.     GOP has breached the Agreement by failing, neglecting and refusing to pay Kuecker the remaining amount due.

29.     As a result of GOP's refusal and failure to pay Kuecker, Kuecker has been and continues to be damaged in the amount of $2,972,622.19, together with interest accruing as provided by the Agreement.

WHEREFORE, Plaintiff prays for judgment in its favor and against Defendant on its First Cause of Action for breach of contract in the amount of $2,972,622.19, further awarding Plaintiff interest thereon and its costs and fees incurred pursuant to the Agreement, and for such other and further relief as this Court deems just and proper.

### SECOND CAUSE OF ACTION
**Foreclosure of Construction Lien**
**Against Defendant Greater Omaha Packing Co., Inc.**

30.     Kuecker, for its second cause of action against GOP, incorporates the foregoing

paragraphs as if fully set forth herein.

31.     GOP is the contracting owner of the Property pursuant to Neb.Rev.Stat. § 52-

127(3).

32.     The Agreement is a real estate improvement contract as defined by Neb.Rev.Stat.

§ 52-130(1).

33.     Kuecker installed the Execution System and provided materials and related

services on the Property for which Kuecker was not paid in full.

34.     The last date services or materials were furnished or performed was

approximately February 22, 2019.

35.     On June 19, 2019 and within 120 days after the last services were performed

and/or materials were provided, Kuecker recorded the construction lien with the Register of the

Deeds in Douglas County, Nebraska against the Property at Instrument #2019044825 in the

amount of $2,972,622.19 representing the remaining amount due under the Agreement plus the

accrued interest as of the date of filing.  As interest continues to accrue, the current amount owed

is $2,972,622.19.

36.     By virtue of the fact that GOP has failed to pay the full amount due and owing to

Kuecker, Kuecker is entitled to foreclose on its construction lien for the balance of

$2,972,622.19, together with interest accruing thereon, costs of this action, and such other relief

in accordance with law and equity.

WHEREFORE, Plaintiff prays for judgment as follows:

a.      That Plaintiff be declared to have a valid lien on the property;

b.      For judgment declaring the priority and paramount status between the construction lien and all other interest in the Property;

c.      For judgment against Defendant for the total sum of $2,972,622.19, together with interest accruing thereon, costs of recording the construction lien, and all other court costs in this action;

d.      That Defendant be ordered to pay Plaintiff all sums due and owing and that Defendant will be in default of such payment if it is not received within twenty (20) days from the entry of judgment;

e.      In the event of such default, an order that the above-described Property (or such portions as Defendant designates) be sold either by the sheriff of Douglas County, Nebraska, or by a special master appointed by the court, and the proceeds be applied to satisfy the judgment subject only to any superior claim or interest adjudged by the Court;

f.      That in the event of such sale, that all junior interest in the Property, including that of Defendant, be foreclosed of all right, title, interest, and equity of redemption in and to said property and that a writ of assistance be issued directly to the sheriff of Douglas County, Nebraska, to place the purchaser at the aforesaid sale in possession of such premises; and

g.      That Plaintiff receive its costs expended herein and for such further and other relief as equity may require.

## THIRD CAUSE OF ACTION
### Unjust Enrichment
### Against Defendant Greater Omaha Packing Co., Inc.
### (In the Alternative to Breach of Contract)

37.     Kuecker, for its third cause of action against GOP, incorporates the foregoing paragraphs as if fully set forth herein.

38.     Kuecker conferred upon GOP a significant and material economic benefit in the nature of work and services performed under the Agreement.

39.     Upon information and belief, GOP knew or should have known that Kuecker had a reasonable expectation of payment for the services, materials, labor and equipment provided.

40.     GOP has received, accepted and benefitted from the services, materials, labor and equipment provided by Kuecker in an amount not less than $2,972,622.19.

41.     Kuecker has not been paid for the services, materials, labor and equipment provided.

42.     It would be inequitable and unjust for GOP to retain the benefit of Kuecker's services, materials, labor and equipment without making restitution for the full value of Kuecker's improvements to the Property.

WHEREFORE, Plaintiff prays this Court enter judgment against Defendant on its Third Cause of Action for an award of damages suffered and sustained by Plaintiff in the amount of no less than $2,972,622.19, further awarding Plaintiff interest thereon and its cost and fees incurred, and for such other and further relief as equity may require.

## **JURY DEMAND**

Plaintiff Demands a Jury Trial on all issues triable to a jury under the law.

## **LOCATION OF TRIAL**

Plaintiff requests that trial be held in Omaha, Nebraska.


DATED this 31st day of July, 2020.


KUECKLER LOGISTICS GROUP, INC., Plaintiff,


BY:   /s/ Brian J. Brislen
Brian J. Brislen, #22226
Craig F. Martin, #21812
Andrew R. Wilkinson, TX #24093370
LAMSON DUGAN & MURRAY LLP
10306 Regency Parkway Drive
Omaha, NE 68114-3743
Tel: 402-397-7300
Fax: 402-397-7824
bbrislen@ldmlaw.com
cmartin@ldmlaw.com
awilkinson@ldmlaw.com

711854

# EXHIBIT 1



## For:



# Box Storage System
# Omaha, NE

Submitted to:
Angelo Fili

Proposal #8214 R6

May 3, 2017

Prepared By:
Jim Kuecker (816) 331-7070
Brandon Fosbinder (816) 331-7070

|   |                 |
|---|-----------------|
|   | Draft           |
|   | Internal review |
| X | External        |

Non-Disclosure Agreement
This document is the property of Kuecker Logistics Group and may not be reproduced.
It is an unpublished work protected under the Federal copyright laws.

Project:   Box Storage System                © Kuecker Logistics Group



Proposal 8214 R6
May 3, 2017



May 3, 2017


Mr. Angelo Fili
Executive Vice President
Greater Omaha Packing Co. Inc.
3001 "L" Street
Omaha, NE 68107


Dear Mr. Fili,

Thank you for the opportunity to work with Greater Omaha Packing Co. on this evaluation and feasibility of a Box Storage System and distribution operation for the Omaha, NE facility.

The following is an update to the proposal and pricing based upon the Engineering Phase 1 of this project. We will in the following days be providing the full analysis for the box optimization, spec document, and description of operation.

We feel this effort has resulted in some excellent opportunities for Greater Omaha Packing Co. to improve their operation. The concept detailed in this document is easily justifiable and if implemented will give Greater Omaha Packing Co. a great deal of flexibility and a more efficient system moving forward.

We are looking forward to helping Greater Omaha Packing Co. take the next step in this process.

Sincerely,

Jim Kuecker
VP System Sales



*Proposal 8214 R6*

*May 3, 2017*



## Contents

**1 Introduction to Kuecker ................................................................. 4**
1.1     About Kuecker Logistics Group ...................................................... 4
1.2     Project Information ...................................................................... 5
1.3     Contact Information ..................................................................... 5
     1.3.1    Customer Site Information ..................................................... 5
     1.3.2    Abbreviations ........................................................................ 5
**2 Goals of the Presentation ............................................................. 6**
**3 New Concept for Consideration .................................................... 7**
3.1     Basic Design process .................................................................... 7
3.2     Carousel System Design parameters ............................................ 8
3.3     Case Sizes ................................................................................... 9
3.4     Provided by Greater Omaha Packing or General Contractor.............. 15
**4 Return on Investment (ROI) Analysis ......................................... 16**
4.1     ROI numbers/highlights of system .............................................. 16
     4.1.1    Highlights ............................................................................. 16
     4.1.2    System Manning (Preliminary) – Cooler/Fresh Side...................... 16
4.2     ROI System Design Spreadsheet .................................................. 18
     4.2.1    Carousel System Design ROI (Based on 20 stacks) ..................... 18
4.3     Storage System Pricing ................................................................ 19
     4.3.1    Phase 1 – Engineering (In Process)........................................ 19
     4.3.2    Phase 2 - Base System Implementation................................... 19
**5 Box Optimization Analysis and Specification Document.................. 20**
**6 Sales Agreement ....................................................................... 21**
6.1     Conditions.................................................................................. 21
6.2     Warranty.................................................................................... 21
6.3     Conditions of Erection / General Points ......................................... 21
6.4     Additional Articles ...................................................................... 23
     6.4.1    Contract Documents ............................................................. 23
     6.4.2    Standard Terms and Conditions ............................................ 23



*Proposal 8214 R6*

*May 3, 2017*



# 1 Introduction to Kuecker

## 1.1  About Kuecker Logistics Group

Since 1980, Kuecker Logistics Group, Inc. (KLG) has specialized in providing innovative solutions to suit our clients' needs for integrated material handling systems.

KLG's experience is founded on the right combination of people and equipment. We offer the most technologically advanced product lines to provide the best in performance, quality and safety.

In addition, we take pride in our ability to establish a close relationship with our clients. KLG as a company makes a commitment to honor our promises, fulfill our customers' requests, finish the job on time, and offer continued professional support.

Our services include operational analysis and systems engineering as well as furnishing pre-engineered products or KLG's custom-fabricated products. We will install your system, manage your project, and provide all of the training and start up assistance that you require.

Our experience enables us to handle any type of challenge from multi-million dollar fully integrated systems, to retrofitting existing systems, to providing simple equipment requirements.



*Proposal 8214 R6*

*May 3, 2017*



## 1.2  Project Information

Project name:  Greater Omaha Packing Co. – Facility Box Storage System
Project number:  8214 R6

## 1.3  Contact Information

For information regarding this project please contact:

Name:    Kuecker Logistics Group

Contact:   Jim Kuecker – VP Systems Sales
E-mail:    jim@kuecker.com

Contact:   Brandon Fosbinder – Director of Concepting and Estimation
E-mail:    brandon@kuecker.com

Contact:   Daryl Bush – Project Manager
E-mail:    dbush@kuecker.com

Tel.:     (816) 331-7070
Fax:     (816) 331-7888

### 1.3.1  Customer Site Information

Name:    Greater Omaha Packing Co. Company
      3001 "L" Street
      Omaha, NE 68107

Contact:   Mr. Angelo Fili
Phone:    402-731-1700
Email:    angelo@greateromaha.com

### 1.3.2  Abbreviations

KLG     Kuecker Logistics Group
GOP     Greater Omaha Packing Co.



*Proposal 8214 R6*
*May 3, 2017*



# 2 Goals of the Presentation

Included in this presentation are concepts KLG has been working on for the Omaha, NE Facility Box Storage System(s).

Our intent is to show you what we have come up with at this time.

Some of the concepts go beyond your request for design and hardware changes.  We have been pursuing some alternate layouts as the final system design must meet Greater Omaha Packing Co.'s Storage, throughput rate, financial, and least amount of risk during implementation requirements.

Included in this presentation is the following concept:

**Carousel System** with 16 Lane Accumulation Deck and Palletizing System
**Future Unit Load ASRS w/ Shuttle System**



Project:   Box Storage System          Page 6/31          © Kuecker Logistics Group
Omaha, NE



*Proposal 8214 R6*
*May 3, 2017*



# 3 New Concept for Consideration

## 3.1  Basic Design process

The first step, when considering investing in a new/retrofitted automated material handling system, is to realize that the system will totally change the warehouse operation.

When designing an automated system, the first objective is to establish the optimal size of the system and the appropriate sub-systems. Both need to facilitate and enhance any requirements in the normal operation of the warehouse.  Size absolutely does matter, when we are talking about a system you want to operate at the highest efficiency with the lowest cost.  Too small will simply result in extra operational cost or "bottlenecking" the system; too big is just a waste of money.

In consideration of the before mentioned philosophy KLG has developed the following concept based upon the information provided by Greater Omaha Packing Co. The following information will describe in detail how the conceptual design will work.



*Proposal 8214 R6*

*May 3, 2017*



## 3.2  Carousel System Design parameters

KLG submits the following for consideration as design solutions for the Greater Omaha Packing Co. – Omaha, NE Distribution Center:

### *Base System with (20) Quad Carousel Stacks:*

*Single Box Storage = 55,680 boxes @ 95% utilization = 52,896 box locations*
*Future Cooler Storage = 25 boxes per pallet x 1,060 pallets = 26,500 box locations*
*Future Freezer Storage = 2,970 pallet locations*

Intelligrated Conveyor System
Carousel Sorter and Accumulation Deck Sorter
Automatic Palletizing System
- Palletizer, Stretch Wrapper, Corner Wrap Print and Apply

Allen Bradley Control System
(20) Quad Carousel Stacks – (55,680) box locations
*Future* Freezer ASRS w/ Shuttle System – (2,970) pallet locations
Catwalk Structures for Maintenance Access to Critical Areas
(1) WMS/WCS per KLG Specification
*Future* Storage Racking – 5 high (1,060) pallet locations
- Cooler Staging/Ground Beef
  - 4 & 2 Deep Pushback (940) pallet locations
  - Single Deep Selective (120) pallet locations



*Proposal 8214 R6*

*May 3, 2017*



### 3.3  Case Sizes

#### Fab Boxes

| Item Description | Style | Length | Width | Depth | Board Combination | ECT | Outside Liner | Flute | Single Box Storage | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| GOP SMALL BREAKER | DC | 23 | 14 13/16 | 8 15/16 | 56-33-56 | 44ECT | K | C | ok | #1 used fab box - glued box |
| GOP HALF PK BREAKER | DC | 23 | 14 13/16 | 7 1/4 | 69-40-69 | 44ECT | K | C | ok | #1 used export box - glued box |
| LARGE HANDSET BREAKER | DC | 24 3/4 | 18 7/8 | 9 | 69-26-69 | 44ECT | K | C | ok | Large Fab - least used - glued box |
| STEAK BOX | DC | 17 1/2 | 11 3/8 | 6 | 35-26-35 | 32ECT | K | C | - | Clam shell - strapped ** |

**Steak box will need to be changed to a glued box to be accepted into the Single Box Storage System.

#### Ground Beef Boxes

| Item Description | Style | Length | Width | Depth | Board Combination | ECT | Outside Liner | Flute | Single Box Storage | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 80lb CHUB | DC | 22 3/4 | 16 11/16 | 7 15/16 | 56-33-56 | 44ECT | K | C | no | Clam shell - strapped |
| PATTY BOX | DC | 17 1/2 | 11 3/8 | 6 | 35-26-35 | 32ECT | K | C | no | Clam shell - strapped |
| CHUB SMALL BREAKER | DC | 23 | 14 13/16 | 8 15/16 | 56-33-56 | 44ECT | K | C | not day 1 | glued box |
| CHUB HALF PACK BREAKER | DC | 23 | 14 13/16 | 7 1/4 | 69-40-69 | 44ECT | K | C | not day 1 | glued box |

#### Offall Boxes

| Item Description | Style | Length | Width | Depth | Board Combination | ECT | Outside Liner | Flute | Single Box Storage | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 15# OXTAIL | DC | 22 3/4 | 9 5/8 | 3 | 42-26-42 | 200# | K | B | NA | Clam shell - strapped |
| 20# UTILITY | DC | 15 | 10 | 4 | 35-26-42 | 32ECT | K | B | NA | Clam shell - strapped |
| 30# UTILITY | DC | 18 | 12 | 4 1/2 | 35-26-42 | 32ECT | K | B | NA | Clam shell - strapped |
| LIVER COVER | DC | 17 3/4 | 15 1/16 | 4 5/8 | 35-26-35 | 32ECT | K | C | NA | Clam shell - strapped |
| LIVER BOTTOM | DC | 17 5/16 | 14 1/4 | 5 1/8 | 35-26-35 | 32ECT | K | C | NA | Clam shell - strapped |
| 60# COVER KILL CLIMACOAT | DC | 21.6875 | 16 9/16 | 6 1/16 | 42-33-42 | 200# | K | B | NA | 2-piece box - strapped |
| 60# BODY KILL CLIMACOAT | DC | 21 1/2 | 16 | 6 | 56-36-56 | 44ECT | K | B | NA | 2-piece box - strapped |
| 60# COVER FAB 5 DOWN CLIMACOAT | DC | 22 7/16 | 15 1/16 | 7 1/4 | 35-26-35 | 32ECT | K | B | NA | 2-piece box - strapped |
| 60# BODY FAB 5 DOWN CLIMACOAT | DC | 21 7/8 | 14 7/8 | 7 1/4 | 56-36-56 | 44ECT | K | B | NA | 2-piece box - strapped |

| Item Description | Style | Length | Width | Depth | Board Combination | ECT | Outside Liner | Flute | Single Box Storage | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| GOP COMBO BIN | HSC | 45 | 38 3/4 | 42 3/16 | 42-30-42-30-69 | 61ECT | K | BC | NA | Combo Storage |



**Proposal 8214 R6**

**May 3, 2017**



### *Entire System – Full Site:*



Project:   Box Storage System       Page 10/31       © Kuecker Logistics Group
Omaha, NE



**Proposal 8214 R6**

*May 3, 2017*



## *Future Freezer Storage:*



Project:   Box Storage System       Page 11/31       © Kuecker Logistics Group
Omaha, NE



Proposal 8214 R6

May 3, 2017



## Base System Cold Storage:





*Proposal 8214 R6*

*May 3, 2017*



### *Base System Carousel Stacks:*



### *Base System Accumulation Deck and Palletizing Area:*



Project:   Box Storage System        Page 13/31        © Kuecker Logistics Group
Omaha, NE



Proposal 8214 R6

May 3, 2017



## Base System Elevation View:



65ft clear over carousels
35ft clear over accumulation deck and palletizing area

Project:  Box Storage System        Page 14/31        © Kuecker Logistics Group
Omaha, NE



Proposal 8214 R6

May 3, 2017



### 3.4  Provided by Greater Omaha Packing or General Contractor

- All building, Civil, floor and foundation and construction works
- Any submission to the local authority and approval.
- Spare-parts and preventive maintenance after the operational start-up.
- All sprinkler system requirements
- Main power supply (MCCs) / VFDs
- Main power supply to ancillary devices (i.e. stretch wrappers, palletizers, etc.) and control panels
- Main network drops/switches, etc.
- In plant offices and restroom
- Applicable Sales & Use Taxes & Permits



Proposal 8214 R6
May 3, 2017



# 4 Return on Investment (ROI) Analysis

## 4.1 ROI numbers/highlights of system

### 4.1.1 Highlights

1) Reduction of box damage
2) Reduction of leakers
3) Ergonomics
4) Reduction of Work Comp claims
5) Box Optimization – Increase margins on single box selectivity
6) Customer Service
7) Reduction in Training
8) Safety
9) Reduction in Forklift Equipment vs. old system
10) Size of Existing Building vs. New Building
11) Other uses for old Box DC
   - Possible Ground Beef Production

### 4.1.2 System Manning (Preliminary) – Cooler/Fresh Side

*NOTE: Freezer is separate – TBD (Outside 3PL)

1) 4 people per shift – palletizing and loading trailers with forklifts
2) 2 technicians per shift – utilize existing staff also for maintenance
3) 1 person per shift – hand (Rework) line
4) Total of 7 people for year 1

Supervisors were not included in our total

Other Notes:

1) 2,400 head a day maximum production
   a. 6.5 boxes per head average
   b. 15 hours production
   c. 15,600 Boxes per day
   d. 1,040 Boxes per hour
   e. 17.33 Boxes Per Minute – Average Capacity (Overall System Throughput)
2) Conveyor System
   a. Average Capacity (Overall System Throughput) 17.33 boxes per minute
   b. Maximum Capacity – 34.67 boxes in and 34.67 boxes out per minute (total of 70 boxes per minute)
   c. Rated Capacity (Machine Rate) – 80 BPM
3) Palletizer (ea)
   a. Average Capacity 15-17 boxes per minute
   b. Maximum Capacity – 24 boxes per minute
   c. Rated Capacity (Machine Rate) – 30 BPM
4) Single Box Storage System
   a. Sustained Rate – Variable pending box location in system



*Proposal 8214 R6*

*May 3, 2017*



     b.  Machine Rate 3 Dual Cycles Per Aisle/stack
          i.  20 Aisles/Stacks = 60 Dual Cycles Per Minute
5)     2,080 per hour Dual cycle
6)     15 hours x 2,080 = 31,200, 11 hours x 2,080 = 22,880, 9 hours = 18,720, 7 hours = 14,560



*Proposal 8214 R6*

*May 3, 2017*



## 4.2  ROI System Design Spreadsheet

### 4.2.1  Carousel System Design ROI (Based on 20 stacks)

| ROI Worksheet for Automated Box Storage System - Carousel Design | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| New System Hardware Costs | System purchase | End of Year 1 | End of Year 2 | End of Year 3 | End of Year 4 | End of Year 5 | End of Year 6 | End of Year 7 |
| Budgetary estimate of material handling cost (including Freezer ASRS) | $ 22,756,382 | | | | | | | |
| **Budgetary Costs Total** | $ 22,756,382 | | | | | | | |
| **Existing System Personnel Costs** | | | | | | | | |
| Existing system cost per FTE measured annually (with 3% inflation) | | 32,600 | $ 33,578 | $ 34,585 | $ 35,623 | $ 36,692 | $ 37,792 | $ 38,926 |
| Estimated number of FTE in picking operation (growth at 10% per year) | | 44 | 48 | 53 | 59 | 64 | 71 | 78 |
| **Annual cost of existing system** | | $ 1,434,400 | $ 1,625,175 | $ 1,841,324 | $ 2,086,220 | $ 2,363,687 | $ 2,678,057 | $ 3,034,239 |
| **New System Personnel Costs** | | | | | | | | |
| New system cost per FTE measured annually (with 3% inflation) | | 32,600 | $ 33,578 | $ 34,585 | $ 35,623 | $ 36,692 | $ 37,792 | $ 38,926 |
| Estimated number of FTE in picking operation (growth at actual estimate for each year) | | 12 | 13 | 15 | 16 | 18 | 19 | 21 |
| Estimated number of FTE in freezer operation (growth at actual estimate for each year) | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Annual cost of new system** | | $ 391,200 | $ 443,230 | $ 502,179 | $ 568,969 | $ 644,642 | $ 730,379 | $ 827,520 |
| **Productivity Savings Subtotal** | | $ 1,043,200 | $ 1,181,946 | $ 1,339,144 | $ 1,517,251 | $ 1,719,045 | $ 1,947,678 | $ 2,206,719 |
| **Depreciation** | | | | | | | | |
| Annual Equipment Depreciation - 7 year straight line depreciation @ 35% tax rate | | $ 1,137,819 | $ 1,137,819 | $ 1,137,819 | $ 1,137,819 | $ 1,137,819 | $ 1,137,819 | $ 1,137,819 |
| **Reduction in Box Damage** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Reduction of Leakers** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Ergonomics** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Reduction in Work Comp Claims** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Box Optimization** | | 6,240,000 | $ 6,240,000 | $ 6,240,000 | $ 6,240,000 | $ 6,240,000 | $ 6,240,000 | $ 6,240,000 |
| **Customer Service** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **(4) Trailers in Yard (i.e. floaters)** | | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| **Reduction in Training** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Safety** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Reduction in Forklift Equipment** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **TOTAL SAVINGS PER YEAR** | | $ 8,421,019 | $ 8,559,765 | $ 8,716,963 | $ 8,895,070 | $ 9,096,864 | $ 9,325,497 | $ 9,584,538 |
| **CASH FLOW STREAM** | | $ (14,335,363) | $ (5,775,598) | $ 2,941,365 | $ 11,836,435 | $ 20,933,299 | $ 30,258,796 | $ 39,843,334 |
| Return on investment vs. Material Handling Cost(expressed in years) | | 2.67 | | | | | | |
| Total positive cash flow over 7 year period | | $39,843,334 | | | | | | |

Building Cost Including refrigeration



*Proposal 8214 R6*

*May 3, 2017*



## 4.3  Storage System Pricing

### 4.3.1  Phase 1 – Engineering (In Process)

| Description - Phase 1 Engineering | Price |
|---|---|
| PHASE 1 - Engineering | $ 126,500.00 |

### 4.3.2  Phase 2 - Base System Implementation

Final pricing based on completion of Phase 1 – Engineering.

| Description - 20 Stacks | Price |
|---|---|
| Mech. Hardware - New Conveyor System | $ 3,249,227.35 |
| Mech. Hardware - New Palletizing System (Qty. 2) | $ 1,605,605.00 |
| Mech. Hardware - New Carousel Stacks (Qty 20) | $ 8,835,125.00 |
| Express Line with Spiral, Truckloader, Scanner, etc. | $ 295,287.45 |
| Controls - PLC, Devices, Sortation Control Package | $ 2,819,425.00 |
| Mechanical installation - Entire System | $ 2,321,500.00 |
| Electrical installation - Entire System | $ 1,385,625.00 |
| Project Services (includes the following) | $ 808,250.00 |
|    Project Management | |
|    On-site support / test & debug | |
| Lift Equipment | $ 63,513.16 |
| Waste removal | $ 30,000.00 |
| Base contract total | $ 21,413,557.95 |
| *Redundant line from Fab* | $ 290,797.05 |
| Base contract + Alternates | $ 21,704,355.00 |

| | |
|---|---|
| Freight All - Est. Billed @ Actual | $ 336,400.00 |

| | |
|---|---|
| Applicable Taxes NA (Customer Responsible for Sales Taxes) | $ - |

| Additional Alternates/Options | Price |
|---|---|
| *Expedited Carousels (Reduces project delivery by ~10 weeks)* | $ 498,895.00 |
| *FUTURE: New Pushback & Selective Racking (1,060 locations) - Installed and Delivered* | $ 198,950.00 |
| *FUTURE: New Freezer ASRS Unit Load ASRS w/ DCS Shuttle (2,440 locations) - Installed & Delivered* | $ 2,023,375.00 |
| *FUTURE: Drive In/Drive Thru Racking in lieu of ASRS (Freezer) - VARIANCE* | $ (612,029.00) |
| *FUTURE: Secondary Outbound Conveyor From Carousels to Palletizer* | $ 440,627.80 |
| *FUTURE: Divert From Fab to Shipping* | $ 250,327.73 |
| *Remove/Add 1 Carousel Stack (2,784 box locations)* | $ 631,314.63 |



*Proposal 8214 R6*

*May 3, 2017*



# 5 Box Optimization Analysis and Specification Document

The following section will be provided upon completion of the Engineering analysis.



*Proposal 8214 R6*

*May 3, 2017*



# 6 Sales Agreement

## 6.1 Conditions

Price:
- The quoted is a net price, including freight, packaging, static and erection.  Excl. federal and/or local taxes.

Method of payment:

**Phase 2 - Base System Implementation Payment Terms**
- 40 % of Equipment at Order – Net
- 40 % of Engineering and Project Management at Order - Net
- 90 % of Equipment upon delivery and inventory of equipment – net 30
- 10 % Hand over (Customer starts using the system)
- Payable within 30 days
- 95% Labor billed upon weekly basis – net 30 – 5% retainer net 30 on hand over of system
- 100% of freight upon delivery-Net 30 (unless collect, then billed direct.)

Delivery:
- Delivery date is to be in accordance with a mutually agreed upon schedule that is yet to be defined.

Period of Validity     14 Days

## 6.2   Warranty

Excluding further claims, especially consequential damages, the period of warranty for all mechanical and electrical parts, apart from wear-and-tear parts, is two years.

## 6.3   Conditions of Erection / General Points

When determining the erection prices we assumed that we will be undisturbed in the erection procedure and that this will be without any lengthy interruptions due to other circumstances arising by the customer. If such an interruption is necessary, it has to be compensated. During the time of the interruption the customer takes the responsibility for all goods that are located, stored or installed at the site as well as any necessary costs for intermediate storage.

Electricity, water and a sufficiently large storage area in the immediate vicinity of the construction site are to be made available to us by the customer and free of charge. We assume that the builder will supply the sanitary facilities.

The storage area has to be of such a condition that the material stored in this area is not damaged.

Project:   Box Storage System      Page 21/31      © Kuecker Logistics Group
Omaha, NE



*Proposal 8214 R6*

*May 3, 2017*



The access roads to the site and the storage area are to be sufficiently reinforced such that it is possible to use heavy goods vehicles; mobile cranes and fork lift trucks on them in all weather conditions.
In cases where the erection is carried out with a mobile crane, it should be possible for this crane to drive into and off the slab easily. The builder is to provide, free of charge, an access road to the slab that meets our needs.

At least one week before we start working the site must be in the condition as described above.

When calculating and constructing the slab, the customer must consider the loads that will be imposed by the erection crane.

The offloading of the conveyor components and any internal transport to the site are included in our quotation.

We are assuming that the unevenness of the floor of the concrete slab will not exceed the tolerances that have been laid down in the FEM Guidelines. If these tolerances are exceeded then it may be necessary to invoice you separately for any additional costs incurred.

Levelling of the floor slab is not included in our quotation.

A sufficiently large area, directly bordering the erection area, has to be supplied to us for the assembly of the material handling system.

When erecting and aligning the material handling installation we will keep to the tolerances that are laid down by the manufacturers.

At the end of the erection the floor slab is to be cleared that is to say, "swept clean" by our erectors.

A more thorough cleaning of the floor as well as cleaning of the material handling installation is not included within the scope of the supply.



Proposal 8214 R6
May 3, 2017



## 6.4  Additional Articles

Proposal No. 8214 R6

Date: May 3, 2017

Effective to: May 27, 2017

This Sales Agreement, hereinafter called "Sales Agreement," made by and between Greater Omaha Packing Co. Inc., hereinafter called "Purchaser," and Kuecker Logistics Group, 801 West Markey Road, Belton, Missouri hereinafter called "Seller," constitutes Agreement of the parties as follows:

### 6.4.1  Contract Documents

In addition to the Standard Terms and Conditions set forth in Part B below, the following documents ("Additional Contract Documents") are also part of this Sales Agreement and are hereby incorporated by reference herein.  To the extent any such Additional Contract Document contains any term or condition inconsistent with the Standard Terms and Conditions below, the Standard Terms and Conditions shall govern, with the exception of ARTICLE 7 SHIPMENT, and ARTICLE 14 PURCHASE PRICE; PAYMENT, where the additional contract documents shall supersede ARTICLES 7 and 14.   The Additional Contract Documents, copies of which are appended hereto, are as follows:

(1) Kuecker Logistics Group Proposal 8214 R6 dated May 3, 2017.

### 6.4.2  Standard Terms and Conditions

#### 6.4.2.1  Article 1 Definitions:

As used in this Sales Agreement, the term "Equipment" shall mean all the Equipment, machinery, parts and other items intended to be installed permanently at the Worksite; the term "Work" shall mean all the Equipment, installation, items and services to be supplied or performed by Seller hereunder, including all materials, supplied, drawings and data, manufacturing, installation and other services, specified in this Sales Agreement; the term "Purchase Price" shall mean the compensation to be paid to the Seller in consideration for the performance of the Work; and the term "Worksite" shall mean the location or locations where the Equipment is to be installed or which are to be used in the installation of the Equipment.

#### 6.4.2.2  Article 2 Permits:

Prior to the installation of the Equipment, Purchaser shall procure and pay for all building, erection and other licenses, permits, authorizations and inspections required in connection with the Equipment, as well as but not limited to any engineering fees and/or environmental studies.  Seller shall not be responsible for any failure of the Equipment to comply with building, electrical or other codes or regulations of local, state or federal agencies or authorities.

Project:  Box Storage System      Page 23/31      © Kuecker Logistics Group
Omaha, NE



*Proposal 8214 R6*

*May 3, 2017*



### 6.4.2.3  Article 3 Safety Devices:

Guards or safety devices as required by State or local laws are not included in this proposal.  All equipment will comply with OSHA standards.

### 6.4.2.4  Article 4 Labor and Personnel:

Seller shall furnish all labor and personnel required for the installation of the Equipment at the Worksite where labor is included in the purchase price.  The Purchase Price is based upon Seller's employing labor during regular working hours.  Purchaser shall have the option to request Seller to employ overtime labor at Purchaser's additional cost and expense.  Any such request to employ overtime labor shall be made by means of a written change order.

### 6.4.2.5  Article 5 Subcontractors and Assignments:

Seller may assign or subcontract any of its obligations under this Sales Agreement to any supplier, builder or other contractor which Seller and Buyer mutually consider qualified. Without the prior written consent of Seller, Purchaser shall not assign this Sales Agreement or any part thereof; provided, however, that, if Seller consents to any assignment, the assignee shall, as a condition to such assignment, agree to be subject to the terms and conditions of this Sales Agreement.

### 6.4.2.6  Article 6 Taxes:

Unless otherwise indicated, the price contains no provision for sales, use, excise, or other similar taxes.  It is Purchaser's responsibility to pay any such taxes should any such tax be levied upon Seller.  If, in Seller's opinion, Purchaser has neither paid such tax nor established to Sellers satisfaction exemption there from, Seller may pay same and in such event Purchaser will reimburse Seller immediately.  If taxes are included as part of the price and the rate or amount of the tax is increased or decreased, Purchaser will pay any increased taxes and Seller will give credit to Purchaser for any tax decrease.  Seller will pay such tax when due and shall be reimbursed by Purchaser immediately upon notification by Seller.   Notwithstanding Article 15:   RESERVATION OF TITLE AND SECURITY INTEREST, Purchaser shall be solely responsible for the prompt payment of any and all personal property taxes of any kind that may become due or payable with respect to the Equipment at any time following delivery thereof to the Worksite.

### 6.4.2.7  Article 7 Shipment:

Unless otherwise indicated, seller shall ship the Equipment F.O.B. Purchaser's plant.  Seller agrees to pay for shipping costs and shall use a mutually agreed upon carrier.

### 6.4.2.8  Article 8 Unloading Charges:

Unless otherwise indicated, all local transfer and unloading charges are to be paid for by Purchaser.



*Proposal 8214 R6*

*May 3, 2017*



### 6.4.2.9  Article 9 Claims for Shortage:

Seller will consider no claim for shortage or errors unless made immediately upon receipt of shipment.

### 6.4.2.10   Article 10 Site Conditions and Provisions by Purchaser:

Purchaser, at its own expense, shall provide at the Worksite reasonable means of access to a minimum of one dock door, with the availability of a dock leveler, a completely enclosed building to protect Seller's equipment from the elements, completion of water-tight roof and such electric current, water, heat, ventilation, light and other utilities and facilities required for the installation of the Equipment.   In the event that any elevator or crane service owned by Purchaser shall be available at the Worksite, Seller may, without charge, use any such service for handling of materials during installation.   Purchaser shall allow Seller access to the Worksite for inspection of compliance to these requirements, prior to commencement of the installation.

Additional provisions and conditions set forth in Attachment A, Site Conditions Provided by Purchaser, are hereby incorporated by reference herein as part of this Sales Agreement.

### 6.4.2.11   Article 11 Insurance and Risk of Loss:

Upon delivery of the Equipment to the Purchaser, Purchaser shall be responsible for and shall bear any and all risk of loss of or damage to the Equipment.

### 6.4.2.12   Article 12 Changes, Delays:

At any time prior to final payment, Purchaser may request in writing any substitutions, deviations, additions, or deletions (hereinafter referred to as "Changes") in the Equipment and in the specifications or drawings incorporated in this Sales Agreement.   All the terms and conditions of this Sales Agreement shall apply to such Changes.   If Seller's performance is materially delayed or prevented by Purchaser, by any such Changes or by other causes within control of Purchaser, Purchaser agrees to reimburse Seller for expenses incident to such delay including, without limitation, the costs of storing, maintaining, repairing, and refurbishing Equipment, demurrage, labor and material escalation and pull out charges.   In such event, Purchaser also agrees to excuse the delay and accept Seller's performance at an appropriately deferred completion date.   Where Seller's performance under this Sales Agreement is delayed as above, the Purchase Price shall be revised based upon labor wage rates, material costs and other conditions prevailing at the time of actual performance.   If the changes or delays made by Purchaser can be established as resulting in any reduced cost to Seller, Purchaser will be credited with the amount of such reduction.   The amount, if any, of such reduction shall be determined by Seller.

### 6.4.2.13   Article 13 Delivery:

Delivery promises are based on the present promises of Seller's suppliers and vendors.   Seller will not be held liable for delays caused by such suppliers and vendors.   All deliveries are subject to change required by governmental restrictions and priorities.



*Proposal 8214 R6*
*May 3, 2017*



### 6.4.2.14   Article 14 Purchase Price; Payment:

In consideration of the performance of the Work, Purchaser shall pay to Seller the Purchase Price specified in this Sales Agreement.

#### Phase 1 - Engineering Payment Terms
- 50% down payment – Net
- 50% upon completion of the phase 1 engineering and design analysis – Net 30

#### Phase 2 - Base System Implementation Payment Terms
- 40 % of Equipment at Order – Net
- 40 % of Engineering and Project Management at Order - Net
- 90 % of Equipment upon delivery and inventory of equipment – net 30
- 10 % Hand over (Customer starts using the system)
- Payable within 30 days
- 95% Labor billed upon weekly basis – net 30 – 5% retainer net 30 on hand over of system

Should Purchaser inform Seller of any deficiencies prior to thirty (30) days from completion of installation, the amount of the retainer necessary to correct the claimed deficiencies will be mutually determined and Purchaser will pay the retainer down to the determined amount.  When the stated deficiencies are corrected, purchaser will pay remaining retainer balance to seller.

100% of freight upon delivery-Net 30 (unless collect, then billed direct.)

### 6.4.2.15   Article 15 Reservation of Title and Security Interest:

Notwithstanding the transfer of possession by Seller to Purchaser and without affecting the passage of the risk of loss to Purchaser as provided in Article 11:  INSURANCE AND RISK OF LOSS, Seller retains legal tile to the equipment until 80% paid.  In the event it is ever determined by any Court of competent jurisdiction that title has passed to Purchaser, Purchaser does hereby grant to Seller a Purchase Money Security Interest in the equipment until full and final payment is made therefore by Purchaser.  If Seller for any reason does not retain title to the equipment until fully and finally paid Seller shall have the rights of a secured creditor under the Uniform Commercial Code for the jurisdiction applicable to this Sales Agreement.  Purchaser hereby authorizes Seller to sign and file on behalf of Purchaser as the Debtor, any financing statements or other documents with state or local recording offices which may be required to prefect such security interest.

All rights, title and interest to the software and documentation, if any, provided hereunder shall at all times remain with Seller.  Seller hereby grants Purchaser a non-transferable and nonexclusive perpetual license to use all computer software manufactured and provided by Seller under this Agreement at the site of the Work.  Purchaser agrees to use such software strictly in compliance with the terms of this Agreement, and for the use(s) contemplated herein.  Even though Purchaser does not become an owner of a copy of the



*Proposal 8214 R6*

*May 3, 2017*



software until it receives title to the Equipment, Seller grants permission for Purchaser to exercise the rights of an owner as set forth in 17 USC 117, that is, to make archival or backup copies of the software, to adapt it as necessary for it to run on the Equipment for which it is licensed, and to run it as an aid in maintaining the Equipment, Purchaser specifically agrees not to copy the software for any purpose other than those set forth in 17 USC 117, not to utilize it at any other site, and not to furnish, disclose, or otherwise make said software, or any portion thereof, available to any third party. Any action by Purchaser in contravention of this provision shall constitute a breach of this contract entitling Seller to the return of the software and any and all copies thereof. Purchaser hereby acknowledges that Seller shall have the right to specific enforcement of the terms of this provision.

### 6.4.2.16   Article 16 Drawings and Specifications:

Specifications of this proposal and accompanying drawings are the Seller's property, loaned to Purchaser for record and information purposes only and are subject to recall at any time prior to our final approval of this Sales Agreement.

### 6.4.2.17   Article 17 Delayed Payments:

In the event that Purchaser fails to make due and punctual payments for the Equipment and/or Work as provided herein, interest shall accrue on the amount due and unpaid at the rate of one percent (1%) per month for each full calendar month or part thereof during which such amount shall be outstanding, such interest to commence to accrue on the fifteenth (15th) day after such amount is due and payable hereunder. If the interest rate provided herein exceeds the maximum interest rate permitted by law, then the interest payable shall be at such maximum permissible rate.

### 6.4.2.18   Article 18 Contingencies:

In the event of any condition or contingency, existing or future, which is beyond the reasonable control and without the fault or negligence of Seller ("Event of Force Majeure") which prevents or delays, or materially increases the cost of, the performance by Seller of this Sales Agreement, Seller shall be entitled to an appropriate extension of time for performance of this Sales Agreement and an equitable adjustment in the Purchase Price. Events of Force Majeure shall include, without limitation, acts of God, explosions, fire, floods, transport delays, strikes, insurrection, labor disputes and interference by civil or military authorities. If an Event of Force Majeure occurs, Seller shall take measures to mitigate and minimize the effect of such Event and to continue with the performance of its obligations under this Sales Agreement.

### 6.4.2.19   Article 19 Cancellation:

(a) This Sales Agreement may be canceled upon the occurrence of any of the following events:

(1) In the event that either party shall breach or fail to comply with any provisions of this Sales Agreement and such breach or failure shall continue for a period of thirty (30) days



*Proposal 8214 R6*
*May 3, 2017*



after the giving of written notice thereof by the other party, the other party may cancel this Sales Agreement immediately upon the giving of notice thereof to the defaulting party.

(2) Notwithstanding the foregoing, if Purchaser shall have failed to make any payment due under this Sales Agreement within thirty (30) days after having been so notified in writing by Seller, Seller may cancel this Sales Agreement immediately after the expiration of the thirty (30) day period by giving notice of such cancellation to Purchaser.

(b) In the event of any cancellation of this Sales Agreement by Seller for default on Purchaser's part in the payment of any portion of the Purchase Price hereunder, Seller shall have all the rights and remedies afforded by the laws of Kansas.

The rights and remedies referred to in this Article are cumulative, and Seller shall not be required to make an election at any time. Seller shall be entitled to assert its claim of a mechanic's lien against the Equipment and the property upon which it is erected at any time before the expiration of the time fixed by law for filing such lien.

(c) In the event of any cancellation of this Sales Agreement, Purchaser shall nevertheless be obligated to pay Seller an amount equal to Seller's actual cost of performance plus a reasonable profit hereunder up to the effective time of the cancellation.

(d) Except as set forth above, this Sales Agreement shall not be subject to cancellation by either party after the date of execution hereof.

### 6.4.2.20   Article 20 Warranty:
The Seller will assign any manufacturer's warranty to Purchaser. Seller shall perform all workmanship in a workmanlike manner.

THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN AS SPECIFICALLY SET FORTH HEREIN.

### 6.4.2.21   Article 21 Use of Installed Portions of the Equipment:
Whenever, as determined by Seller, the installation of any portion of the Equipment has been completed, Seller may make available such portion for Purchaser's use, provided, however, that Seller and Purchaser shall mutually agree on the terms and conditions of such use. Except as otherwise agreed by Seller and Purchaser (including where appropriate, an adjustment in the Purchase Price and/or schedule otherwise provided for in this Sales Agreement), such use shall not interfere with the installation of the remainder of the Equipment. Seller shall not be liable for the cost of repairs, rework or replacement which may be required due to ordinary wear and tear resulting from such use.

### 6.4.2.22   Article 22 Insurance by Seller:
Seller will maintain insurance coverage covering its operation as follows:



*Proposal 8214 R6*

*May 3, 2017*



Comprehensive General Liability - $1,000,000 per occurrence, $ 2,000,000.00 general aggregate

Personal Injury Liability - $1,000,000 Limit.
Umbrella - $4,000,000 per occurrence, aggregate $4,000,000
Business Auto - Bodily Injury & Property Damage - $1,000,000 Combined Single Limit.
Worker's Compensation - Statutory - Employer's Liability; $500,000 each accident; $500,000 each employee; $500,000 Policy Limit

### 6.4.2.23   Article 23 Limitation of Liability:

Notwithstanding any other provision of this Sales Agreement, EXCEPT THE WARRANTY PROVISIONS, Seller shall not be liable to Purchaser or anyone claiming through Purchaser (a) for any special, indirect, incidental or consequential damages of any kind whatsoever, whether such damages arise out of the use, inability to use, failure of, defects in, the Equipment or otherwise, or (b) for any charges or expenses of any nature incurred without Seller's written consent.

### 6.4.2.24   Article 24 Indemnification:

To the fullest permitted by law, the Contractor (Kuecker) shall indemnify and hold harmless Greater Omaha Packing from and against all claims, damages, losses and expenses, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor or anyone directly employed by it.

### 6.4.2.25   Article 25 Waiver:

Except as otherwise expressly provided in this Sales Agreement, no failure on the part of either party to exercise, and no delay in exercising, any right, privilege, or power under this Sales Agreement shall operate as a waiver or relinquishment thereof; nor shall any single or partial exercise by either party of any right, privilege or power under this Sales Agreement preclude any other or further exercise thereof, or the exercise of any other right, privilege or power.  Waiver of any party of any breach of any provision of this Sales Agreement shall not constitute or be construed as a continuing waiver, or as a waiver of any other breach of any provision of this Sales Agreement.

### 6.4.2.26  Article 26 Entire Agreement:

This instrument, together with any attachments specifically made a part of this agreement and any other documents incorporated in such attachments by reference, embodies the whole agreement of the parties relating to the subject matter of this Sales Agreement and supersedes any and all prior oral or written specifications, communications and agreements by or on behalf of the parties.  This Sales Agreement may not be varied by any purchase order, acknowledgment, confirmation, invoice, or shipping document issued by either party. Any amendments or modifications of this Sales Agreement must be in writing and signed by purchaser and an officer of seller to be binding.



Proposal 8214 R6

May 3, 2017



### 6.4.2.27    Article 27 Governing Law:

This Sales Agreement shall be governed by and interpreted in accordance with the law of the State of Nebraska.

      Proposal 8214 R6      
                          May 3, 2017

APPROVED AND EXECUTED BY:
AUTHORIZED FOR PURCHASE BY:

Greater Omaha Packing

Signature _____

Name _____ *Angelo Fili* _____

Title _*Executive Vice President*_____ Date _*5 - 22 - 2017*_____

AUTHORIZED FOR SELLER BY:

Kuecker Logistics Group, Inc.

Signature _____

Name _____ James R. Kuecker _____

Title _*VP System Sales*_____ Date _*5/26/17*_____

Project:  Box Storage System        Page 31/31        © Kuecker Logistics Group
Omaha, NE



**GREATER OMAHA**
PROVIDING THE HIGHEST QUALITY BEEF

**Addendum to Kuecker Logistics Group Agreement (Proposal 8214 R6 dated 5/3/2017)**

Greater Omaha Packing (GOP) is undertaking a major project involving the design, construction and integration of an on-site automated box storage, retrieval and loading system for its fresh products produced at its Omaha, NE beef processing facility. This Facility Box Storage System project (project) will be coordinated by GOP's Construction Manager, Joaquin Urias who will oversee all phases of the planning, design, and construction of the project.

To achieve all of the project's objectives, including specifications, timelines and, ultimately, the full optimization of the integrated material handling system, GOP will rely on Kuecker Logistics Group (KLG) to furnish the operational analysis, systems engineering, product specifications, installation of the products/system, and provide all training and start up assistance that may be required as well as providing the complete management of the project in coordination with other contractors and vendors through GOP's Construction Manager.

The purpose of this Addendum is to be certain that several of GOP's expectations that may not be stated in the Proposal are understood and agreed upon by KLG and GOP. Specifically:

- KLG acknowledges that GOP is relying on KLG to achieve a facility box storage system design that provides the most efficient such system at the lowest cost.
- KLG acknowledges that GOP is relying on the accuracy of KLG's ROI analysis in Section 4 of the Agreement to justify the estimated costs for the base system implementation as not-to-exceed prices. KLG agrees that GOP must approve any increase in prices listed in Section 4.3 and KLG agrees that any reduction in prices listed in Section 4.3 shall reduce the cost to GOP.
- KLG and GOP shall mutually agree on a delivery/hand over date as referenced in Section 6.1 that shall be as soon as is practicable, but no sooner than the date the system functions as described in Section 4.
- KLG agrees that the Warranty provision in Section 6.2 applies to any and all software required to operate the system.
- KLG agrees that this Addendum shall be considered as an additional contract document as referenced in Section 6.4.
- KLG agrees that the timeline for completing the various stages of the project, as initially agreed, shall be maintained by GOP's project manager and any changes thereto shall be communicated to KLG. KLG will be responsible to keep the project on schedule.
- KLG and GOP agree that any dispute over the terms of the Agreement that is not resolved by mutual agreement shall be submitted to a single arbitrator in Douglas County, Nebraska by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrator may be entered in Douglas County District Court.

Approved and Executed on behalf of GOP by Angelo Fili, Executive Vice President:

_5-22-17_ (signature and date)

Approved and Executed on behalf of KLG by Jim Kuecker, VP System Sales:

_5/26/17_ (signature and date)



**GREATER OMAHA PACKING CO., INC.**

Proudly featuring both Certified Hereford Beef and Certified Angus Beef
P.O. Box 7566 • Omaha, Nebraska 68107

Slaughter  (402) 731-3480   Fax:  (402) 731-7542        Fabrication  (402) 731-1700   (800) 747-5400   Fax: (402) 731-8020

# EXHIBIT 2



## For:



# Box Storage System
# [ Floor 2 ]
# Omaha, NE

Submitted to:
Angelo Fili

Proposal #8453JK R1

February 26, 2018

Prepared By:
Jim Kuecker (816) 331-7070
Brandon Fosbinder (816) 331-7070

| | |
|---|---|
| | Draft |
| | Internal review |
| X | External |

Non-Disclosure Agreement
This document is the property of Kuecker Logistics Group and may not be reproduced.
It is an unpublished work protected under the Federal copyright laws.

Project:   Floor 2 Project                    © Kuecker Logistics Group



*Proposal 8453JK R1*
*February 26, 2018*



February 26, 2018

Mr. Angelo Fili
Executive Vice President
Greater Omaha Packing Co. Inc.
3001 "L" Street
Omaha, NE 68107

Dear Mr. Fili,

Thank you for the opportunity to work with Greater Omaha Packing Co. on Floor 2 project for the Omaha, NE facility.

*Revision 1: This revision eliminates the accumulation on the reject lines and replaces it with gravity roller conveyor. Also the single divert Intralox Sorter for future x-ray process has been replaced with a diverge table.*

Based on our discussions with you and our review of the project requirements, we feel that we have offered the best approach to this project and we look forward to reviewing our proposal and system implementation plan with GOP.

Sincerely,

Jim Kuecker
VP System Sales



*Proposal 8453JK R1*

*February 26, 2018*



## Contents

**1    Introduction to Kuecker ................................................................. 4**
1.1      About Kuecker Logistics Group ............................................... 4
1.2      Project Information ................................................................... 5
1.3      Contact Information ................................................................. 5
    1.3.1    Customer Site Information ................................................ 5
    1.3.2    Abbreviations ................................................................... 5
**2    Executive Summary ....................................................................... 6**
**3    Project Details ............................................................................... 8**
3.1      Scope of Work ......................................................................... 8
3.2      Case Sizes ............................................................................. 11
3.3      Floor 2 System Pricing .......................................................... 12
3.4      Equipment Lead Time ........................................................... 12
3.5      Exceptions & Clarifications ................................................... 13
3.6      Provided by Greater Omaha Packing or General Contractor .... 13
**4    Sales Agreement ......................................................................... 14**
4.1      Conditions .............................................................................. 14
4.2      Warranty ................................................................................ 14
4.3      Conditions of Erection / General Points ................................ 14
4.4      Additional Articles ................................................................. 16
    4.4.1    Contract Documents ....................................................... 16
    4.4.2    Standard Terms and Conditions ...................................... 16



*Proposal 8453JK R1*

*February 26, 2018*



# *1 Introduction to Kuecker*

## 1.1 About Kuecker Logistics Group

Since 1980, Kuecker Logistics Group, Inc. (KLG) has specialized in providing innovative solutions to suit our clients' needs for integrated material handling systems.

KLG's experience is founded on the right combination of people and equipment.  We offer the most technologically advanced product lines to provide the best in performance, quality and safety.

In addition, we take pride in our ability to establish a close relationship with our clients.  KLG as a company makes a commitment to honor our promises, fulfill our customers' requests, finish the job on time, and offer continued professional support.

Our services include operational analysis and systems engineering as well as furnishing pre-engineered products or KLG's custom-fabricated products.  We will install your system, manage your project, and provide all of the training and start up assistance that you require.

Our experience enables us to handle any type of challenge from multi-million dollar fully integrated systems, to retrofitting existing systems, to providing simple equipment requirements.



*Proposal 8453JK R1*
*February 26, 2018*



## 1.2 Project Information

Project name:        Greater Omaha Packing Co. – Floor 2 Project
Project number:      8453JK R1

## 1.3 Contact Information

For information regarding this project please contact:

Name:              Kuecker Logistics Group

Contact:           Jim Kuecker – VP Systems Sales
E-mail:            jim@kuecker.com

Contact:           Brandon Fosbinder – Director of Concepting and Estimation
E-mail:            brandon@kuecker.com

Contact:           Russell Hedrick – Project Manager
E-mail:            rhedrick@kuecker.com

Tel.:              (816) 331-7070
Fax:               (816) 331-7888

### 1.3.1 Customer Site Information

Name:              Greater Omaha Packing Co. Company
                   3001 "L" Street
                   Omaha, NE 68107

Contact:           Mr. Angelo Fili
Phone:             402-731-1700
Email:             angelo@greateromaha.com

### 1.3.2 Abbreviations

KLG                Kuecker Logistics Group
GOP                Greater Omaha Packing Co.



Proposal 8453JK R1
February 26, 2018



# 2 Executive Summary

The primary objective of the GOP Floor 2 initiative is to ensure that 100% of the cases that leave the Floor 2 area are able to be successfully scanned and stored in the new Box Storage Carousel System.

As has been discussed since early in this project – in order for the new Box Storage Carousel and Automatic Palletizing System to work as designed, it is imperative that no more than 1% of the GOP cases that are received there have any form of defect (Bar Code, Box Flap, Bulge, Wet Boxes, etc....).

The Kuecker Logistics Group Project Team has also listened intently to other GOP objectives in regards to the GOP Floor 2 initiative.  Below is an outline of some of the primary technologies that have been incorporated into this new Floor 2 modification project to address these initiatives.  A brief description of the deliverables and how these are achieved is described in further detail broken down by sub-system below.

**SYSTEM OBJECTIVES & BENEFITS:**
1. New Label Verification –
    a. Traditionally this function is located at Scale and Print and Apply prior to Case-seal.
    b. GOP team has asked KLG to remediate this system void post the Case-sealers.
    c. KLG to provide this function post case-seal and prior to box leaving Floor 2.
        i. 50'-8" linear feet of accumulation to handle label defects.
            1. Provides capacity to hold 25 cartons at 23.5" L.
    d. System will verify for…
        i. Product Label No-Reads
        ii. Weight Label No-Reads
        iii. Product Label / Weight Label miss-match
2. New Box Flap, Tab and Seal Verification –
    a. Required for successful equipment operation in the New DC.
    b. KLG to provide this function post case-seal and prior to box leaving Floor 2.
        i. 44'-11" linear feet of accumulation to handle box defects.
            1. Provides capacity to hold 23 cartons at 23.5" L.
    c. System will verify for…
        i. Open Tabs
        ii. Open Flaps
        iii. Over-Pack Height
        iv. Over-Pack Width



*Proposal 8453JK R1*
*February 26, 2018*



3. Staff Reduction Opportunities –
    a. Today GOP associates are typically deployed for label and box seal verification. These associates have been typically stationed on Floor 2, Shipping Dock and Storage areas to resolve. Correcting these issues on Floor 2 with automatic detection will streamline the problem resolution time and efforts.
    b. These associates may be re-deployed to more value added tasks that have a higher ROI for GOP.
4. Maintaining corrective actions at the sealer room is considered to be most effective and keeps the resolution process with the group responsible for finished goods quality.
5. Redundant Lines from Case-sealer Outfeed -
    a. KLG to provide two lines from Case-sealer Outfeed to New DC. This includes the necessary system design configuration that will provide for adding Foreign Object Detection at a later date.
    b. To achieve redundant capability, a single divert Intralox Sorter (Sorter #2) is provided to transfer Floor 2 output between 2 southbound lines to a future Foreign Object Detection and then ultimately to the downstream New DC.
        i. Temporarily (while New DC is being built), 1 of 2 conveyor lines will deliver outbound sealed / labeled boxes to the current Stack Off area.



**Proposal 8453JK R1**

**February 26, 2018**



# *3 Project Details*

## 3.1  Scope of Work

This project consists of the demolition of the existing conveyor coming out of the case sealers.  Once the existing conveyor has been removed, the new system will bring all 3 lines into one central sortation system that will detect no-reads, open flaps and/or bulging boxes to be sorted off the line for manual correction.  (2) Reject sort points have been provided to remove such boxes from the system.  An additional third sort point has been provided to allow for redundant lines feeding x-ray machines and the new box storage system (future).  The system as proposed will include one line tying into the existing conveyor which takes outbound boxes down to the floor level 1.

**_Floor 2 Existing:_**



Project:   Floor 2 Project          Page 8/23          © Kuecker Logistics Group
Omaha, NE



*Proposal 8453JK R1*
*February 26, 2018*



### Floor 2 Proposed System:



Proposal 8453JK R1
February 26, 2018







**Proposal 8453JK R1**
**February 26, 2018**



### 3.2  Case Sizes

GOP & KLG confirmed system to handle the following three boxes sizes:

| | OUTSIDE DIMENSION | | |
|---|---|---|---|
| **Case** | **Length** | **Width** | **Height** |
| Small Box | 23 – 1/2" | 15 – 5/8" | 9 – 1/4" |
| Half Pack Box | 23 – 1/2" | 15 – 5/8" | 7 – 1/2" |
| Large Box | 23 – 1/2" | 18 – 7/8" | 9 – 1/4" |

Below list shows box sizes originally submitted to KLG.

| Fab Boxes | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Item Description | Style | Length | Width | Depth | Board Combination | ECT | Outside Liner | Flute | Single Box Storage | Notes |
| GOP SMALL BREAKER | DC | 23 | 14 13/16 | 8 15/16 | 56-33-56 | 44ECT | K | C | ok | #1 used fab box - glued box |
| GOP HALF PK BREAKER | DC | 23 | 14 13/16 | 7 1/4 | 69-40-69 | 44ECT | K | C | ok | #1 used export box - glued box |
| LARGE HANDSET BREAKER | DC | 24 3/4 | 18 7/8 | 9 | 69-26-69 | 44ECT | K | C | ok | Large Fab - least used - glued box |
| STEAK BOX | DC | 17 1/2 | 11 3/8 | 6 | 35-26-35 | 32ECT | K | C | - | Clam shell - strapped ** |

**Steak box will need to be changed to a glued box to be accepted into the Single Box Storage System.

| Ground Beef Boxes | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Item Description | Style | Length | Width | Depth | Board Combination | ECT | Outside Liner | Flute | Single Box Storage | Notes |
| 80lb CHUB | DC | 22 3/4 | 16 11/16 | 7 15/16 | 56-33-56 | 44ECT | K | C | no | Clam shell - strapped |
| PATTY BOX | DC | 17 1/2 | 11 3/8 | 6 | 35-26-35 | 32ECT | K | C | no | Clam shell - strapped |
| CHUB SMALL BREAKER | DC | 23 | 14 13/16 | 8 15/16 | 56-33-56 | 44ECT | K | C | not day 1 | glued box |
| CHUB HALF PACK BREAKER | DC | 23 | 14 13/16 | 7 1/4 | 69-40-69 | 44ECT | K | C | not day 1 | glued box |

| Offall Boxes | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Item Description | Style | Length | Width | Depth | Board Combination | ECT | Outside Liner | Flute | Single Box Storage | Notes |
| 15# OXTAIL | DC | 22 3/4 | 9 5/8 | 3 | 42-26-42 | 200# | K | B | NA | Clam shell - strapped |
| 20# UTILITY | DC | 15 | 10 | 4 | 35-26-42 | 32ECT | K | B | NA | Clam shell - strapped |
| 30# UTILITY | DC | 18 | 12 | 4 1/2 | 35-26-42 | 32ECT | K | B | NA | Clam shell - strapped |
| LIVER COVER | DC | 17 3/4 | 15 1/16 | 4 5/8 | 35-26-35 | 32ECT | K | C | NA | Clam shell - strapped |
| LIVER BOTTOM | DC | 17 5/16 | 14 1/4 | 5 1/8 | 35-26-35 | 32ECT | K | C | NA | Clam shell - strapped |
| 60# COVER KILL CLIMACOAT | DC | 21.6875 | 16 9/16 | 6 1/16 | 42-33-42 | 200# | K | B | NA | 2-piece box - strapped |
| 60# BODY KILL CLIMACOAT | DC | 21 1/2 | 16 | 6 | 56-36-56 | 44ECT | K | B | NA | 2-piece box - strapped |
| 60# COVER FAB 5 DOWN CLIMACOAT | DC | 22 7/16 | 15 1/16 | 6 1/16 | 35-26-35 | 32ECT | K | B | NA | 2-piece box - strapped |
| 60# BODY FAB 5 DOWN CLIMACOAT | DC | 21 7/8 | 14 7/8 | 7 1/4 | 56-36-56 | 44ECT | K | B | NA | 2-piece box - strapped |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| GOP COMBO BIN | HSC | 45 | 38 3/4 | 42 3/16 | 42-30-42-30-69 | 61ECT | K | BC | NA | Combo Storage |



**Proposal 8453JK R1**

**February 26, 2018**



## 3.3  Floor 2 System Pricing

| Description | Price | |
|---|---|---|
| Mech. Hardware - New Floor 2 Conveyor and Hanging Steel | $ | 208,721.44 |
| Mech. Hardware - New Intralox Scan Verify & Box Integrity Sorter | $ | 68,875.00 |
| Mech. Hardware - New Diverge Table | $ | 22,641.33 |
| Software & Controls - PLC, Devices, Sortation Control Package | $ | 119,943.67 |
| Mechanical installation - Entire System | $ | 117,937.50 |
| Electrical installation - Entire System | $ | 179,426.25 |
| Project Services (includes the following) | $ | 65,687.50 |
|   Engineering & Documentation | | |
|   Project Management | | |
|   On-site support / test & debug | | |
| Lift Equipment | included | |
| Waste removal | $ | 4,830.00 |
| **Base contract total** | **$** | **788,062.69** |
| | | |
| Freight All - **Est. Billed @ Actual** | $ | 12,600.00 |
| | | |
| Applicable Taxes NA (Customer Responsible for Sales Taxes) | $ | - |

| Options | Deduct Price | |
|---|---|---|
| Reduce schedule to two (3-day weekends) | $ | (4,300.00) |

**Option is for two long weekends (Fri,Sat,Sun) back to back** as defined below rather than base approach of 3 weekends (Sat / Sun Only)

- o Weekend 1: KLG starts work at 6:00 AM on Friday thru 6:00 AM on the following Monday
- o Weekend 2: KLG starts work at 6:00 AM on Friday thru 6:00 AM on the following Monday
- o GOP to determine if they want / need to run a 6th day of Fab Production on the Saturday before weekend 1 and after weekend 2 as a means of keeping up with the Production needs

## 3.4  Equipment Lead Time

| | |
|---|---|
| Sortation Equipment: | 12-14 Weeks ARO |
| Conveyor Equipment: | 10-12 Weeks ARO |



*Proposal 8453JK R1*
*February 26, 2018*



### 3.5  Exceptions & Clarifications

- Conveyor is all mild steel – painted
- All motor starter/controllers will be installed in existing MCC's, assumption has been made that sufficient quantity of MCC buckets are available to handle the new additions.
- VFD's will be added to existing VFD control panel.
- Camera Scanner for verification sorter is included.
- Existing GOP electrical drawings will be updated for the new system additions. If CAD drawings cannot be supplied, redlined hard copies of the changes will be provided.
- Galvanized PVC Coated Rigid Steel Conduit to be used in process areas
- Concrete housekeeping pads for the Control Panels not included
- Painting of conduit not included
- Welded supports not included
- Performance & Payment Bonds not included
- Assumed the existing PLC cabinets and hardware will be available for our use.
- NEMA4X rotary style disconnects with auxiliary contacts.
- Supports similar to the existing stainless supports viewed on-site will be provided.
- Included in the cost are electrical permits, fees and inspections.
- Price is based on performing all the work on an open shop basis.
- Proposal is based on working 5 days per week, 9 hours per day. No weekend work has been included except for the scheduled and planned cutover weekends (3 each required).
- The copper prices included are based on the COMEX index of 3.10. We reserve the right to adjust our commodity pricing, add or deduct, at the time of contract award and again after ordering the material. We will need to monitor the market changes together.

### 3.6  Provided by Greater Omaha Packing or General Contractor

- All building, Civil, floor and foundation and construction works
- Any submission to the local authority and approval.
- Clear work area.
- Spare-parts and preventive maintenance after the operational start-up.
- All sprinkler system and or lighting requirements
- Main power supply (MCCs) / VFDs
- Main power supply to ancillary devices (i.e. x-ray machines, case sealers, workstations etc.) and control panels
- Main network drops/switches, etc.
- In plant offices and restroom
- Dock door access for unloading material
- Applicable Sales & Use Taxes & Permits



**Proposal 8453JK R1**

**February 26, 2018**



# 4 Sales Agreement

## 4.1 Conditions

Price:
- The quoted is a net price, including freight, packaging, static and erection. Excl. federal and/or local taxes.

Method of payment:
**Base System Implementation Payment Terms**
- 40 % of Equipment at Order – Net
- 40 % of Engineering and Project Management at Order - Net
- 90 % of Equipment upon delivery and inventory of equipment – net 30
- 10 % Hand over (Customer starts using the system)
- Payable within 30 days
- 95% Labor billed upon weekly basis – net 30 – 5% retainer net 30 on hand over of system
- 100% of freight upon delivery-Net 30 (unless collect, then billed direct.)

Delivery:
- Delivery date is to be in accordance with a mutually agreed upon schedule that is yet to be defined.

Period of Validity      14 Days

## 4.2 Warranty

Excluding further claims, especially consequential damages, the period of warranty for all mechanical and electrical parts, apart from wear-and-tear parts, is two years.

## 4.3 Conditions of Erection / General Points

When determining the erection prices we assumed that we will be undisturbed in the erection procedure and that this will be without any lengthy interruptions due to other circumstances arising by the customer. If such an interruption is necessary, it has to be compensated. During the time of the interruption the customer takes the responsibility for all goods that are located, stored or installed at the site as well as any necessary costs for intermediate storage.

Electricity, water and a sufficiently large storage area in the immediate vicinity of the construction site are to be made available to us by the customer and free of charge. We assume that the builder will supply the sanitary facilities.

The storage area has to be of such a condition that the material stored in this area is not damaged.



**Proposal 8453JK R1**

**February 26, 2018**



The access roads to the site and the storage area are to be sufficiently reinforced such that it is possible to use heavy goods vehicles; mobile cranes and fork lift trucks on them in all weather conditions.
In cases where the erection is carried out with a mobile crane, it should be possible for this crane to drive into and off the slab easily. The builder is to provide, free of charge, an access road to the slab that meets our needs.

At least one week before we start working the site must be in the condition as described above.

When calculating and constructing the slab, the customer must consider the loads that will be imposed by the erection crane.

The offloading of the conveyor components and any internal transport to the site are included in our quotation.

We are assuming that the unevenness of the floor of the concrete slab will not exceed the tolerances that have been laid down in the FEM Guidelines. If these tolerances are exceeded then it may be necessary to invoice you separately for any additional costs incurred.

Levelling of the floor slab is not included in our quotation.

A sufficiently large area, directly bordering the erection area, has to be supplied to us for the assembly of the material handling system.

When erecting and aligning the material handling installation we will keep to the tolerances that are laid down by the manufacturers.

At the end of the erection the floor slab is to be cleared that is to say, "swept clean" by our erectors.

A more thorough cleaning of the floor as well as cleaning of the material handling installation is not included within the scope of the supply.



**Proposal 8453JK R1**
**February 26, 2018**



## 4.4  Additional Articles

Proposal No. 8453JK R1

Date: February 26, 2018

Effective to: March 25, 2018

This Sales Agreement, hereinafter called "Sales Agreement," made by and between Greater Omaha Packing Co. Inc., hereinafter called "Purchaser," and Kuecker Logistics Group, 801 West Markey Road, Belton, Missouri hereinafter called "Seller," constitutes Agreement of the parties as follows:

### 4.4.1  Contract Documents

In addition to the Standard Terms and Conditions set forth in Part B below, the following documents ("Additional Contract Documents") are also part of this Sales Agreement and are hereby incorporated by reference herein.  To the extent any such Additional Contract Document contains any term or condition inconsistent with the Standard Terms and Conditions below, the Standard Terms and Conditions shall govern, with the exception of ARTICLE 7 SHIPMENT, and ARTICLE 14 PURCHASE PRICE; PAYMENT, where the additional contract documents shall supersede ARTICLES 7 and 14.  The Additional Contract Documents, copies of which are appended hereto, are as follows:

(1) Kuecker Logistics Group Proposal 8453JK R1 dated February 26, 2018

### 4.4.2  Standard Terms and Conditions

#### 4.4.2.1  Article 1 Definitions:

As used in this Sales Agreement, the term "Equipment" shall mean all the Equipment, machinery, parts and other items intended to be installed permanently at the Worksite; the term "Work" shall mean all the Equipment, installation, items and services to be supplied or performed by Seller hereunder, including all materials, supplied, drawings and data, manufacturing, installation and other services, specified in this Sales Agreement; the term "Purchase Price" shall mean the compensation to be paid to the Seller in consideration for the performance of the Work; and the term "Worksite" shall mean the location or locations where the Equipment is to be installed or which are to be used in the installation of the Equipment.

#### 4.4.2.2  Article 2 Permits:

Prior to the installation of the Equipment, Purchaser shall procure and pay for all building, erection and other licenses, permits, authorizations and inspections required in connection with the Equipment, as well as but not limited to any engineering fees and/or environmental studies.  Seller shall not be responsible for any failure of the Equipment to comply with building, electrical or other codes or regulations of local, state or federal agencies or authorities.



*Proposal 8453JK R1*

*February 26, 2018*



### 4.4.2.3 Article 3 Safety Devices:

Guards or safety devices as required by State or local laws are not included in this proposal. All equipment will comply with OSHA standards.

### 4.4.2.4 Article 4 Labor and Personnel:

Seller shall furnish all labor and personnel required for the installation of the Equipment at the Worksite where labor is included in the purchase price.  The Purchase Price is based upon Seller's employing labor during regular working hours.  Purchaser shall have the option to request Seller to employ overtime labor at Purchaser's additional cost and expense.  Any such request to employ overtime labor shall be made by means of a written change order.

### 4.4.2.5 Article 5 Subcontractors and Assignments:

Seller may assign or subcontract any of its obligations under this Sales Agreement to any supplier, builder or other contractor which Seller and Buyer mutually consider qualified. Without the prior written consent of Seller, Purchaser shall not assign this Sales Agreement or any part thereof; provided, however, that, if Seller consents to any assignment, the assignee shall, as a condition to such assignment, agree to be subject to the terms and conditions of this Sales Agreement.

### 4.4.2.6 Article 6 Taxes:

Unless otherwise indicated, the price contains no provision for sales, use, excise, or other similar taxes.  It is Purchaser's responsibility to pay any such taxes should any such tax be levied upon Seller.  If, in Seller's opinion, Purchaser has neither paid such tax nor established to Sellers satisfaction exemption there from, Seller may pay same and in such event Purchaser will reimburse Seller immediately.  If taxes are included as part of the price and the rate or amount of the tax is increased or decreased, Purchaser will pay any increased taxes and Seller will give credit to Purchaser for any tax decrease.  Seller will pay such tax when due and shall be reimbursed by Purchaser immediately upon notification by Seller. Notwithstanding Article 15:   RESERVATION OF TITLE AND SECURITY INTEREST, Purchaser shall be solely responsible for the prompt payment of any and all personal property taxes of any kind that may become due or payable with respect to the Equipment at any time following delivery thereof to the Worksite.

### 4.4.2.7 Article 7 Shipment:

Unless otherwise indicated, seller shall ship the Equipment F.O.B. Purchaser's plant.  Seller agrees to pay for shipping costs and shall use a mutually agreed upon carrier.

### 4.4.2.8 Article 8 Unloading Charges:

Unless otherwise indicated, all local transfer and unloading charges are to be paid for by Purchaser.

### 4.4.2.9 Article 9 Claims for Shortage:

Seller will consider no claim for shortage or errors unless made immediately upon receipt of shipment.



*Proposal 8453JK R1*

*February 26, 2018*



#### 4.4.2.10  Article 10 Site Conditions and Provisions by Purchaser:

Purchaser, at its own expense, shall provide at the Worksite reasonable means of access to a minimum of one dock door, with the availability of a dock leveler, a completely enclosed building to protect Seller's equipment from the elements, completion of water-tight roof and such electric current, water, heat, ventilation, light and other utilities and facilities required for the installation of the Equipment.  In the event that any elevator or crane service owned by Purchaser shall be available at the Worksite, Seller may, without charge, use any such service for handling of materials during installation.  Purchaser shall allow Seller access to the Worksite for inspection of compliance to these requirements, prior to commencement of the installation.

Additional provisions and conditions set forth in Attachment A, Site Conditions Provided by Purchaser, are hereby incorporated by reference herein as part of this Sales Agreement.

#### 4.4.2.11  Article 11 Insurance and Risk of Loss:

Upon delivery of the Equipment to the Purchaser, Purchaser shall be responsible for and shall bear any and all risk of loss of or damage to the Equipment.

#### 4.4.2.12  Article 12 Changes, Delays:

At any time prior to final payment, Purchaser may request in writing any substitutions, deviations, additions, or deletions (hereinafter referred to as "Changes") in the Equipment and in the specifications or drawings incorporated in this Sales Agreement.  All the terms and conditions of this Sales Agreement shall apply to such Changes.  If Seller's performance is materially delayed or prevented by Purchaser, by any such Changes or by other causes within control of Purchaser, Purchaser agrees to reimburse Seller for expenses incident to such delay including, without limitation, the costs of storing, maintaining, repairing, and refurbishing Equipment, demurrage, labor and material escalation and pull out charges.  In such event, Purchaser also agrees to excuse the delay and accept Seller's performance at an appropriately deferred completion date.  Where Seller's performance under this Sales Agreement is delayed as above, the Purchase Price shall be revised based upon labor wage rates, material costs and other conditions prevailing at the time of actual performance.  If the changes or delays made by Purchaser can be established as resulting in any reduced cost to Seller, Purchaser will be credited with the amount of such reduction.  The amount, if any, of such reduction shall be determined by Seller.

#### 4.4.2.13  Article 13 Delivery:

Delivery promises are based on the present promises of Seller's suppliers and vendors.  Seller will not be held liable for delays caused by such suppliers and vendors.  All deliveries are subject to change required by governmental restrictions and priorities.

#### 4.4.2.14  Article 14 Purchase Price; Payment:

In consideration of the performance of the Work, Purchaser shall pay to Seller the Purchase Price specified in this Sales Agreement.



*Proposal 8453JK R1*
*February 26, 2018*



## Phase 1 - Engineering Payment Terms
- 50% down payment – Net
- 50% upon completion of the phase 1 engineering and design analysis – Net 30

## Phase 2 - Base System Implementation Payment Terms
- 40 % of Equipment at Order – Net
- 40 % of Engineering and Project Management at Order - Net
- 90 % of Equipment upon delivery and inventory of equipment – net 30
- 10 % Hand over (Customer starts using the system)
- Payable within 30 days
- 95% Labor billed upon weekly basis – net 30 – 5% retainer net 30 on hand over of system

Should Purchaser inform Seller of any deficiencies prior to thirty (30) days from completion of installation, the amount of the retainer necessary to correct the claimed deficiencies will be mutually determined and Purchaser will pay the retainer down to the determined amount. When the stated deficiencies are corrected, purchaser will pay remaining retainer balance to seller.

100% of freight upon delivery-Net 30 (unless collect, then billed direct.)

### 4.4.2.15   Article 15 Reservation of Title and Security Interest:

Notwithstanding the transfer of possession by Seller to Purchaser and without affecting the passage of the risk of loss to Purchaser as provided in Article 11: INSURANCE AND RISK OF LOSS, Seller retains legal tile to the equipment until 80% paid. In the event it is ever determined by any Court of competent jurisdiction that title has passed to Purchaser, Purchaser does hereby grant to Seller a Purchase Money Security Interest in the equipment until full and final payment is made therefore by Purchaser. If Seller for any reason does not retain title to the equipment until fully and finally paid Seller shall have the rights of a secured creditor under the Uniform Commercial Code for the jurisdiction applicable to this Sales Agreement. Purchaser hereby authorizes Seller to sign and file on behalf of Purchaser as the Debtor, any financing statements or other documents with state or local recording offices which may be required to prefect such security interest.

All rights, title and interest to the software and documentation, if any, provided hereunder shall at all times remain with Seller. Seller hereby grants Purchaser a non-transferable and nonexclusive perpetual license to use all computer software manufactured and provided by Seller under this Agreement at the site of the Work. Purchaser agrees to use such software strictly in compliance with the terms of this Agreement, and for the use(s) contemplated herein. Even though Purchaser does not become an owner of a copy of the software until it receives title to the Equipment, Seller grants permission for Purchaser to exercise the rights of an owner as set forth in 17 USC 117, that is, to make archival or backup copies of the software, to adapt it as necessary for it to run on the Equipment for which it is licensed, and to run it as an aid in maintaining the Equipment, Purchaser



*Proposal 8453JK R1*

*February 26, 2018*



specifically agrees not to copy the software for any purpose other than those set forth in 17 USC 117, not to utilize it at any other site, and not to furnish, disclose, or otherwise make said software, or any portion thereof, available to any third party. Any action by Purchaser in contravention of this provision shall constitute a breach of this contract entitling Seller to the return of the software and any and all copies thereof. Purchaser hereby acknowledges that Seller shall have the right to specific enforcement of the terms of this provision.

### 4.4.2.16   Article 16 Drawings and Specifications:

Specifications of this proposal and accompanying drawings are the Seller's property, loaned to Purchaser for record and information purposes only and are subject to recall at any time prior to our final approval of this Sales Agreement.

### 4.4.2.17   Article 17 Delayed Payments:

In the event that Purchaser fails to make due and punctual payments for the Equipment and/or Work as provided herein, interest shall accrue on the amount due and unpaid at the rate of one percent (1%) per month for each full calendar month or part thereof during which such amount shall be outstanding, such interest to commence to accrue on the fifteenth (15th) day after such amount is due and payable hereunder. If the interest rate provided herein exceeds the maximum interest rate permitted by law, then the interest payable shall be at such maximum permissible rate.

### 4.4.2.18   Article 18 Contingencies:

In the event of any condition or contingency, existing or future, which is beyond the reasonable control and without the fault or negligence of Seller ("Event of Force Majeure") which prevents or delays, or materially increases the cost of, the performance by Seller of this Sales Agreement, Seller shall be entitled to an appropriate extension of time for performance of this Sales Agreement and an equitable adjustment in the Purchase Price. Events of Force Majeure shall include, without limitation, acts of God, explosions, fire, floods, transport delays, strikes, insurrection, labor disputes and interference by civil or military authorities. If an Event of Force Majeure occurs, Seller shall take measures to mitigate and minimize the effect of such Event and to continue with the performance of its obligations under this Sales Agreement.

### 4.4.2.19   Article 19 Cancellation:

(a) This Sales Agreement may be canceled upon the occurrence of any of the following events:

(1) In the event that either party shall breach or fail to comply with any provisions of this Sales Agreement and such breach or failure shall continue for a period of thirty (30) days after the giving of written notice thereof by the other party, the other party may cancel this Sales Agreement immediately upon the giving of notice thereof to the defaulting party.

(2) Notwithstanding the foregoing, if Purchaser shall have failed to make any payment due under this Sales Agreement within thirty (30) days after having been so notified in writing by



*Proposal 8453JK R1*

*February 26, 2018*



Seller, Seller may cancel this Sales Agreement immediately after the expiration of the thirty (30) day period by giving notice of such cancellation to Purchaser.

(b) In the event of any cancellation of this Sales Agreement by Seller for default on Purchaser's part in the payment of any portion of the Purchase Price hereunder, Seller shall have all the rights and remedies afforded by the laws of Kansas.

The rights and remedies referred to in this Article are cumulative, and Seller shall not be required to make an election at any time. Seller shall be entitled to assert its claim of a mechanic's lien against the Equipment and the property upon which it is erected at any time before the expiration of the time fixed by law for filing such lien.

(c) In the event of any cancellation of this Sales Agreement, Purchaser shall nevertheless be obligated to pay Seller an amount equal to Seller's actual cost of performance plus a reasonable profit hereunder up to the effective time of the cancellation.

(d) Except as set forth above, this Sales Agreement shall not be subject to cancellation by either party after the date of execution hereof.

### 4.4.2.20 Article 20 Warranty:
The Seller will assign any manufacturer's warranty to Purchaser. Seller shall perform all workmanship in a workmanlike manner.

THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN AS SPECIFICALLY SET FORTH HEREIN.

### 4.4.2.21 Article 21 Use of Installed Portions of the Equipment:
Whenever, as determined by Seller, the installation of any portion of the Equipment has been completed, Seller may make available such portion for Purchaser's use, provided, however, that Seller and Purchaser shall mutually agree on the terms and conditions of such use. Except as otherwise agreed by Seller and Purchaser (including where appropriate, an adjustment in the Purchase Price and/or schedule otherwise provided for in this Sales Agreement), such use shall not interfere with the installation of the remainder of the Equipment. Seller shall not be liable for the cost of repairs, rework or replacement which may be required due to ordinary wear and tear resulting from such use.

### 4.4.2.22 Article 22 Insurance by Seller:
Seller will maintain insurance coverage covering its operation as follows:
Comprehensive General Liability - $1,000,000 per occurrence, $ 2,000,000.00 general aggregate

Personal Injury Liability - $1,000,000 Limit.
Umbrella - $4,000,000 per occurrence, aggregate $4,000,000



*Proposal 8453JK R1*

*February 26, 2018*



Business Auto - Bodily Injury & Property Damage - $1,000,000 Combined Single Limit.
Worker's Compensation - Statutory - Employer's Liability; $500,000 each accident;
$500,000 each employee; $500,000 Policy Limit

### 4.4.2.23   Article 23 Limitation of Liability:

Notwithstanding any other provision of this Sales Agreement, EXCEPT THE WARRANTY
PROVISIONS, Seller shall not be liable to Purchaser or anyone claiming through Purchaser
(a) for any special, indirect, incidental or consequential damages of any kind whatsoever,
whether such damages arise out of the use, inability to use, failure of, defects in, the
Equipment or otherwise, or (b) for any charges or expenses of any nature incurred without
Seller's written consent.

### 4.4.2.24   Article 24 Indemnification:

To the fullest permitted by law, the Contractor (Kuecker) shall indemnify and hold harmless
Greater Omaha Packing from and against all claims, damages, losses and expenses,
arising out of or resulting from performance of the Work, provided that such claim, damage,
loss or expense is attributable to bodily injury, sickness, disease, or death, or to injury to or
destruction of tangible property (other than the Work itself), but only to the extent caused by
the negligent acts or omissions of the Contractor or anyone directly employed by it.

### 4.4.2.25   Article 25 Waiver:

Except as otherwise expressly provided in this Sales Agreement, no failure on the part of
either party to exercise, and no delay in exercising, any right, privilege, or power under this
Sales Agreement shall operate as a waiver or relinquishment thereof; nor shall any single
or partial exercise by either party of any right, privilege or power under this Sales
Agreement preclude any other or further exercise thereof, or the exercise of any other right,
privilege or power.  Waiver of any party of any breach of any provision of this Sales
Agreement shall not constitute or be construed as a continuing waiver, or as a waiver of
any other breach of any provision of this Sales Agreement.

### 4.4.2.26   Article 26 Entire Agreement:

This instrument, together with any attachments specifically made a part of this agreement
and any other documents incorporated in such attachments by reference, embodies the
whole agreement of the parties relating to the subject matter of this Sales Agreement and
supersedes any and all prior oral or written specifications, communications and agreements
by or on behalf of the parties.  This Sales Agreement may not be varied by any purchase
order, acknowledgment, confirmation, invoice, or shipping document issued by either party.
Any amendments or modifications of this Sales Agreement must be in writing and signed
by purchaser and an officer of seller to be binding.

### 4.4.2.27   Article 27 Governing Law:

This Sales Agreement shall be governed by and interpreted in accordance with the law of
the State of Nebraska.

 

Proposal 8453JK R1
February 26, 2018

APPROVED AND EXECUTED BY:
AUTHORIZED FOR PURCHASE BY:

Greater Omaha Packing

Signature _____

Name _Angelo Fili_____

Title _Vice President____ Date _3-12-2018__

AUTHORIZED FOR SELLER BY:

Kuecker Logistics Group, Inc.

Signature _____

Name _____James R. Kuecker_____

Title _____ Date _____

Project:   Floor 2 Project          Page 23/23          © Kuecker Logistics Group
Omaha, NE

# EXHIBIT 3



## For:



# ASPEN Replacement Proposal
# Omaha, NE

Submitted to:
Angelo Fili

Proposal #8715JK

May 9, 2018

Prepared By:
Jim Kuecker (816) 331-7070
Rene Danler (816) 331-7070

| | |
|---|---|
| | Draft |
| | Internal review |
| X | External |

Non-Disclosure Agreement
This document is the property of Kuecker Logistics Group and may not be reproduced.
It is an unpublished work protected under the Federal copyright laws.

Project:   Floor 2 Project

© Kuecker Logistics Group



**Proposal 8715JK**
**May 9, 2018**



## Contents

**1  Introduction to Kuecker .......................................................................................... 4**
  1.1    About Kuecker Logistics Group ...................................................................... 4
  1.2    Project Information ........................................................................................... 5
  1.3    Contact Information ......................................................................................... 5
     1.3.1  Customer Site Information ....................................................................... 5
     1.3.2  Abbreviations ............................................................................................ 5
**2  Executive Summary .............................................................................................. 6**
**3  Functional Overview ............................................................................................ 7**
  3.1    Description of Operation ................................................................................ 7
     3.1.1  WES System Functionality ....................................................................... 7
**4  Scope of Work ...................................................................................................... 10**
  4.1    Project Schedule ............................................................................................ 10
  4.2    Equipment and Services Provided by KLG .................................................. 10
  4.3    Assumptions & Clarifications ....................................................................... 10
**5  System Pricing .................................................................................................... 11**
  5.1    Pricing – Base System ................................................................................... 11
  5.2    Notes ............................................................................................................... 11
**6  Sales Agreement ................................................................................................. 12**
  6.1    Conditions ...................................................................................................... 12
  6.2    Warranty ......................................................................................................... 12
  6.3    Conditions of Erection / General Points ...................................................... 12
  6.4    Additional Articles ......................................................................................... 14
     6.4.1  Contract Documents ................................................................................ 14
     6.4.2  Standard Terms and Conditions ............................................................. 14



**Proposal 8715JK**
**May 9, 2018**



# 1 Introduction to Kuecker

## 1.1 About Kuecker Logistics Group

Since 1980, Kuecker Logistics Group, Inc. (KLG) has specialized in providing innovative solutions to suit our clients' needs for integrated material handling systems.

KLG's experience is founded on the right combination of people and equipment. We offer the most technologically advanced product lines to provide the best in performance, quality and safety.

In addition, we take pride in our ability to establish a close relationship with our clients. KLG as a company makes a commitment to honor our promises, fulfill our customers' requests, finish the job on time, and offer continued professional support.

Our services include operational analysis and systems engineering as well as furnishing pre-engineered products or KLG's custom-fabricated products. We will install your system, manage your project, and provide all of the training and start up assistance that you require.

Our experience enables us to handle any type of challenge from multi-million dollar fully integrated systems, to retrofitting existing systems, to providing simple equipment requirements.



**Proposal 8715JK**

**May 9, 2018**



## 1.2  Project Information

Project name:          Greater Omaha Packing Co. – ASPEN Replacement
Project number:       8715JK

## 1.3  Contact Information

For information regarding this project please contact:

Name:                Kuecker Logistics Group

Contact:             Jim Kuecker – VP Systems Sales
E-mail:              jim@kuecker.com

Contact:             Rene Danler – Senior Director – Systems Integration / Software / Project Mgt.
E-mail:              rene@kuecker.com

Tel.:                (816) 331-7070
Fax:                 (816) 331-7888

### 1.3.1  Customer Site Information

Name:                Greater Omaha Packing Co. Company
                     3001 "L" Street
                     Omaha, NE 68107

Contact:             Mr. Angelo Fili
Phone:               402-731-1700
Email:               angelo@greateromaha.com

### 1.3.2  Abbreviations

KLG                  Kuecker Logistics Group
GOP                  Greater Omaha Packing Co.



Proposal 8715JK

May 9, 2018



# 2 Executive Summary

This proposal provides pricing for Kuecker Logistics Group (KLG) to supply software and engineering services to add the required functionality to replace Greater Omaha Packing's ASPEN Warehouse functionality.   The required features and functions will be tightly integrated into the New Automated Box Storage solution being provided for the GOP facility in Omaha, NE.  Pricing is based on the scope of work as outlined within this proposal. After contract award, KLG will complete any required work for the ASPEN Replacement simultaneously with the New Automated Box Storage Solution. The functionality will be added to the existing software functional specifications for the New Automated Box Storage solution and will appear as a single deliverable in terms of software, services, specification documents, user documentation, training, and support.

Kuecker Logistics Group has been engaged to provide the Warehouse Execution Software for the Greater Omaha Packing (GOP) New Automated Box Storage System.  GOP has requested KLG to provide a solution that allows them to retire their current ASPEN systems warehousing functions.

In order to retire ASPEN from warehousing functions, KLG will provide the software and services defined in this proposal simultaneously with the New Automated Box Storage system.  There will be a single installation and startup plan for the entire system with no gaps in timeline between the original system and these enhancements.  This proposal identifies these functions and features at a high level.  Additional detail will be provided in the functional specification and detailed design phase of the project.



**Proposal 8715JK**
**May 9, 2018**



# 3 Functional Overview

## 3.1 Description of Operation

This section outlines the key functional requirements to be provided with this project. The intent of this section is to convey our understanding of the scope of work required and is the basis for our estimate and associated pricing. Deviation, additions, or deletions from this operation could result in deducts or increases depending on the magnitude of the required differences.

### 3.1.1 WES System Functionality

The New Automated Box Storage Solution is responsible for the inventory induction, tracking, picking, palletizing, staging and truck loading of Fab Muscle Cuts Boxes inducted to the system from the case sealer and weight labeling systems.

Other categories of product (ground beef boxes, steak boxes, raw materials, trimmings and offal) are not going to be inducted into the New Automated Box Storage Solution. This project enhancement will provide the functions necessary to identify boxes or combos of these product categories, building pallets, storing pallets in the cooler or storage trailers and shipping pallets/boxes.

ALPHA will provide *Key*Chain WES with orders that include all categories of product. Order lines for products that are stored in the New Automated Box Storage System will be handled by functionality already being provided with the New Automated Box Storage Solution. Order lines for products handled outside of the New Automated Box Storage System are manually assembled onto pallets. The pallets are then "built" using new *Key*Chain WES functionality onto pallets that can be stored in inventory locations, stored in storage trailers or loaded on shipping trailers for shipment. These pallets will fulfill the order requirements and be included in all shipping documentation (manifests and bill of ladings). The inventory will be relieved from the existing Box Storage inventory when the shipment is "completed" in *Key*Chain WES.



**Proposal 8715JK**
**May 9, 2018**



*Key*Chain WES will provide the following capabilities for non-box storage inventory:

- Build pallets of Existing Box Storage inventory
  - Single item pallets or
  - Mixed item pallets
- Track inventory for non-combos from point where box is first built onto pallet until ship confirmation time.
- Move cases from pallet to pallet
- Load pallets onto trailers
  - For storage
  - For shipping
  - For transfer to outside warehouses (OSW)
- Unload pallets
  - From storage trailers
  - From shipping trailers
  - From transfer trailer
- Move combos onto trailers
  - For shipping
  - For transfer to outside warehouses (OSW)
  - For temporary storage
- Move pallets from location to location.
- Generate manifests for orders
  - Including product from new automated box storage and existing box storage.
- Generate BOLs (Laser Printer)
  - Including product from new automated box storage and existing box storage
- Send Alpha Ship Manifests for all product shipped.
- Existing Box Storage product
  - Is not hard allocated
  - Is not picked (using *Key*Chain WES Picking Transactions)
  - Is moved to pallets and moved to trailers
  - Combos can be moved to storage or shipping trailers.
  - Is manifested and is on Bill of Ladings
  - Is included in all shipping displays/queries
  - Is available on Inventory Displays and Queries (excluding Combo's)
- Existing Box Storage Shipping
  - Provide load sheets
    - Box Storage Requirements
    - Combo requirements (allows for attachment of combo scale labels)
    - Other requirements (Existing Box Storage, non-combo requirements)
  - Trailer/Order Visibility

Project:  ASPEN Replacement      Page 8/22      © Kuecker Logistics Group
Omaha, NE



**Proposal 8715JK**
**May 9, 2018**



- Show what was ordered, versus what was loaded.
  - o Provide ability to generate
    - Manifests
    - BOL's
    - Ship Confirmation (Send manifest to Alpha)
    - Query/Reports
      - Weight Sheet Query by Order
      - Total Shipments per Day Query
      - Shipments by Product, Customer, Order Query
- Combo Shipping
  - o Provide ability to load combos from combo load sheet.
- Outside warehouse functionality
  - o *Key*Chain WES will move inventory sent to OSW to *Key*Chain WES OSW location (one location per OSW).
  - o Inventory will be tracked by pallet label.
  - o Returned pallets are moved back into inventory when the pallet LPN is scanned
    - *Key*Chain WES will remember the boxes on the pallet.
  - o Shipments do occur for product on OSW outside of WES.
    - Pallets shipped from OSW will require GOP to manually remove them from WES inventory by scanning/entering the pallet LPN (or other methods TBD).

The additional *Key*Chain WES software functionality will run on the existing *Key*Chain WES hardware platform and be accessible through a single login session and from a single menu system.

Retirement of ASPEN's non-warehouse functions is not part of KLG's scope (this includes all purchasing functions, etc...).

*Key*Chain WES RF functionality will be accessed from existing RF terminals (VT Emulator is required on Terminals).   GOP to provide KLG with make/model and screen size for all existing RF Terminals.

Pallets will be built to pre-printed labels provided by GOP (as per current process). All *Key*Chain WES Inventory can be synchronized with ALPHA (New Automated Box Storage and Existing Box Storage).  This does not include Combo's not created in *Key*Chain WES inventory.



**Proposal 8715JK**
**May 9, 2018**



# *4 Scope of Work*

The following outlines the scope of work to be provided by KLG, as well as what we understand to be supplied by other parties. If this information is not correct, please alert us and we will be pleased to modify our scope of work accordingly.

## 4.1 Project Schedule

A mutually agreeable schedule will be determined before the Final Functional Specification Document is approved by GOP. This schedule will coincide with the New Automated Box Storage System schedule.

## 4.2 Equipment and Services Provided by KLG

There are no other services being provided other than to include the ASPEN Warehouse functionality replacement functions into the existing New Automated Box Storage System project deliverables.

No additional equipment or 3rd party purchases are planned for this project.

## 4.3 Assumptions & Clarifications

There are no new assumptions or clarifications from the New Automated Box Storage System proposal.



**Proposal 8715JK**

**May 9, 2018**



# 5 System Pricing

## 5.1 Pricing – Base System

| Task Description | Price |
|---|---|
| • Project Management<br>• Detail Design<br>• In-House Engineering Labor<br>   o Host interface design, development & testing<br>   o Detail Design Specification<br>   o Project specific modifications<br>   o Standard software installation & configuration<br>   o In-house system testing<br>• Documentation<br>• Includes 1 additional person onsite for 8 weeks. | $320,300 |
| Travel & Living Budget | $33,420 |
| Annual Software Maintenance & Support (First Year)<br>  ➤ Remote Support (KeyChain WES Only) | $18,000 |
| Total: | $371,720 |

## 5.2 Notes

- Price is valid for 14 days from the publication date of this proposal.
- Prices based on current scope of work.  Changes to scope of work may require price changes.
- Prices do not include any taxes or import duties (where applicable).
- Pricing is based on KLG's standard Terms and Conditions.
- Pricing only includes services, no hardware or other purchases are included.



**Proposal 8715JK**
**May 9, 2018**



# *6 Sales Agreement*

## 6.1 Conditions

Price:
- The quoted is a net price, including freight, packaging, static and erection. Excl. federal and/or local taxes.

Method of payment:
**Base System Implementation Payment Terms**
- 30 % - Down Payment – Net
- 60 % - Monthly Progressive Payments – Net 30
- 10 % - Upon Beneficial Use – Net 30
- Payable within 30 days

Delivery:
- Delivery date is to be in accordance with a mutually agreed upon schedule that is yet to be defined.

Period of Validity    14 Days

## 6.2 Warranty

Excluding further claims, especially consequential damages, the period of warranty for all software systems is one year from date of beneficial use.

## 6.3 Conditions of Erection / General Points

When determining the erection prices we assumed that we will be undisturbed in the erection procedure and that this will be without any lengthy interruptions due to other circumstances arising by the customer. If such an interruption is necessary, it has to be compensated. During the time of the interruption the customer takes the responsibility for all goods that are located, stored or installed at the site as well as any necessary costs for intermediate storage.

Electricity, water and a sufficiently large storage area in the immediate vicinity of the construction site are to be made available to us by the customer and free of charge. We assume that the builder will supply the sanitary facilities.

The storage area has to be of such a condition that the material stored in this area is not damaged.

Project:  ASPEN Replacement    Page 12/22    © Kuecker Logistics Group
Omaha, NE



**Proposal 8715JK**
**May 9, 2018**



The access roads to the site and the storage area are to be sufficiently reinforced such that it is possible to use heavy goods vehicles; mobile cranes and fork lift trucks on them in all weather conditions.

In cases where the erection is carried out with a mobile crane, it should be possible for this crane to drive into and off the slab easily. The builder is to provide, free of charge, an access road to the slab that meets our needs.

At least one week before we start working the site must be in the condition as described above.

When calculating and constructing the slab, the customer must consider the loads that will be imposed by the erection crane.

The offloading of the conveyor components and any internal transport to the site are included in our quotation.

We are assuming that the unevenness of the floor of the concrete slab will not exceed the tolerances that have been laid down in the FEM Guidelines. If these tolerances are exceeded then it may be necessary to invoice you separately for any additional costs incurred.

Levelling of the floor slab is not included in our quotation.

A sufficiently large area, directly bordering the erection area, has to be supplied to us for the assembly of the material handling system.

When erecting and aligning the material handling installation we will keep to the tolerances that are laid down by the manufacturers.

At the end of the erection the floor slab is to be cleared that is to say, "swept clean" by our erectors.

A more thorough cleaning of the floor as well as cleaning of the material handling installation is not included within the scope of the supply.

Project:  ASPEN Replacement      Page 13/22      © Kuecker Logistics Group
Omaha, NE



Proposal 8715JK
May 9, 2018



## 6.4  Additional Articles

Proposal No. 8715JK

Date: May 9, 2018

Effective to: May 23, 2018

This Sales Agreement, hereinafter called "Sales Agreement," made by and between Greater Omaha Packing Co. Inc., hereinafter called "Purchaser," and Kuecker Logistics Group, 801 West Markey Road, Belton, Missouri hereinafter called "Seller," constitutes Agreement of the parties as follows:

### 6.4.1  Contract Documents

In addition to the Standard Terms and Conditions set forth in Part B below, the following documents ("Additional Contract Documents") are also part of this Sales Agreement and are hereby incorporated by reference herein. To the extent any such Additional Contract Document contains any term or condition inconsistent with the Standard Terms and Conditions below, the Standard Terms and Conditions shall govern, with the exception of ARTICLE 7 SHIPMENT, and ARTICLE 14 PURCHASE PRICE; PAYMENT, where the additional contract documents shall supersede ARTICLES 7 and 14. The Additional Contract Documents, copies of which are appended hereto, are as follows:

(1) Kuecker Logistics Group Proposal 8715JK dated May 9, 2018.

### 6.4.2  Standard Terms and Conditions

#### 6.4.2.1 Article 1 Definitions:

As used in this Sales Agreement, the term "Equipment" shall mean all the Equipment, machinery, parts and other items intended to be installed permanently at the Worksite; the term "Work" shall mean all the Equipment, installation, items and services to be supplied or performed by Seller hereunder, including all materials, supplied, drawings and data, manufacturing, installation and other services, specified in this Sales Agreement; the term "Purchase Price" shall mean the compensation to be paid to the Seller in consideration for the performance of the Work; and the term "Worksite" shall mean the location or locations where the Equipment is to be installed or which are to be used in the installation of the Equipment.

#### 6.4.2.2 Article 2 Permits:

Prior to the installation of the Equipment, Purchaser shall procure and pay for all building, erection and other licenses, permits, authorizations and inspections required in connection with the Equipment, as well as but not limited to any engineering fees and/or environmental

Project:  ASPEN Replacement     Page 14/22      © Kuecker Logistics Group
Omaha, NE


Proposal 8715JK
May 9, 2018


studies. Seller shall not be responsible for any failure of the Equipment to comply with building, electrical or other codes or regulations of local, state or federal agencies or authorities.

### 6.4.2.3 Article 3 Safety Devices:

Guards or safety devices as required by State or local laws are not included in this proposal. All equipment will comply with OSHA standards.

### 6.4.2.4 Article 4 Labor and Personnel:

Seller shall furnish all labor and personnel required for the installation of the Equipment at the Worksite where labor is included in the purchase price. The Purchase Price is based upon Seller's employing labor during regular working hours. Purchaser shall have the option to request Seller to employ overtime labor at Purchaser's additional cost and expense. Any such request to employ overtime labor shall be made by means of a written change order.

### 6.4.2.5 Article 5 Subcontractors and Assignments:

Seller may assign or subcontract any of its obligations under this Sales Agreement to any supplier, builder or other contractor which Seller and Buyer mutually consider qualified. Without the prior written consent of Seller, Purchaser shall not assign this Sales Agreement or any part thereof; provided, however, that, if Seller consents to any assignment, the assignee shall, as a condition to such assignment, agree to be subject to the terms and conditions of this Sales Agreement.

### 6.4.2.6 Article 6 Taxes:

Unless otherwise indicated, the price contains no provision for sales, use, excise, or other similar taxes. It is Purchaser's responsibility to pay any such taxes should any such tax be levied upon Seller. If, in Seller's opinion, Purchaser has neither paid such tax nor established to Sellers satisfaction exemption there from, Seller may pay same and in such event Purchaser will reimburse Seller immediately. If taxes are included as part of the price and the rate or amount of the tax is increased or decreased, Purchaser will pay any increased taxes and Seller will give credit to Purchaser for any tax decrease. Seller will pay such tax when due and shall be reimbursed by Purchaser immediately upon notification by Seller. Notwithstanding Article 15: RESERVATION OF TITLE AND SECURITY INTEREST, Purchaser shall be solely responsible for the prompt payment of any and all personal property taxes of any kind that may become due or payable with respect to the Equipment at any time following delivery thereof to the Worksite.

### 6.4.2.7 Article 7 Shipment:

Unless otherwise indicated, seller shall ship the Equipment F.O.B. Purchaser's plant. Seller agrees to pay for shipping costs and shall use a mutually agreed upon carrier.

Project:  ASPEN Replacement    Page 15/22    © Kuecker Logistics Group
Omaha, NE



Proposal 8715JK
May 9, 2018



### 6.4.2.8  Article 8 Unloading Charges:
Unless otherwise indicated, all local transfer and unloading charges are to be paid for by Purchaser.

### 6.4.2.9  Article 9 Claims for Shortage:
Seller will consider no claim for shortage or errors unless made immediately upon receipt of shipment.

### 6.4.2.10  Article 10 Site Conditions and Provisions by Purchaser:
Purchaser, at its own expense, shall provide at the Worksite reasonable means of access to a minimum of one dock door, with the availability of a dock leveler, a completely enclosed building to protect Seller's equipment from the elements, completion of water-tight roof and such electric current, water, heat, ventilation, light and other utilities and facilities required for the installation of the Equipment.  In the event that any elevator or crane service owned by Purchaser shall be available at the Worksite, Seller may, without charge, use any such service for handling of materials during installation.  Purchaser shall allow Seller access to the Worksite for inspection of compliance to these requirements, prior to commencement of the installation.

Additional provisions and conditions set forth in Attachment A, Site Conditions Provided by Purchaser, are hereby incorporated by reference herein as part of this Sales Agreement.

### 6.4.2.11  Article 11 Insurance and Risk of Loss:
Upon delivery of the Equipment to the Purchaser, Purchaser shall be responsible for and shall bear any and all risk of loss of or damage to the Equipment.

### 6.4.2.12  Article 12 Changes, Delays:
At any time prior to final payment, Purchaser may request in writing any substitutions, deviations, additions, or deletions (hereinafter referred to as "Changes") in the Equipment and in the specifications or drawings incorporated in this Sales Agreement. All the terms and conditions of this Sales Agreement shall apply to such Changes.  If Seller's performance is materially delayed or prevented by Purchaser, by any such Changes or by other causes within control of Purchaser, Purchaser agrees to reimburse Seller for expenses incident to such delay including, without limitation, the costs of storing, maintaining, repairing, and refurbishing Equipment, demurrage, labor and material escalation and pull out charges. In such event, Purchaser also agrees to excuse the delay and accept Seller's performance at an appropriately deferred completion date.  Where Seller's performance under this Sales Agreement is delayed as above, the Purchase Price shall be revised based upon labor wage rates, material costs and other conditions prevailing at the time of actual performance. If the changes or delays made by Purchaser can be established as resulting in any reduced cost to Seller, Purchaser will be credited

Project:  ASPEN Replacement      Page 16/22      © Kuecker Logistics Group
Omaha, NE



**Proposal 8715JK**
**May 9, 2018**



with the amount of such reduction.   The amount, if any, of such reduction shall be determined by Seller.

### 6.4.2.13   Article 13 Delivery:

Delivery promises are based on the present promises of Seller's suppliers and vendors. Seller will not be held liable for delays caused by such suppliers and vendors.  All deliveries are subject to change required by governmental restrictions and priorities.

### 6.4.2.14   Article 14 Purchase Price; Payment:

In consideration of the performance of the Work, Purchaser shall pay to Seller the Purchase Price specified in this Sales Agreement.

#### Phase 2 - Base System Implementation Payment Terms
- 30 % - Down Payment – Net
- 60 % - Monthly Progressive Payments – Net 30
- 10 % - Upon Beneficial Use – Net 30
- Payable within 30 days

Should Purchaser inform Seller of any deficiencies prior to thirty (30) days from completion of installation, the amount of the retainer necessary to correct the claimed deficiencies will be mutually determined and Purchaser will pay the retainer down to the determined amount.  When the stated deficiencies are corrected, purchaser will pay remaining retainer balance to seller.

100% of freight upon delivery-Net 30 (unless collect, then billed direct.)

### 6.4.2.15   Article 15 Reservation of Title and Security Interest:

Notwithstanding the transfer of possession by Seller to Purchaser and without affecting the passage of the risk of loss to Purchaser as provided in Article 11: INSURANCE AND RISK OF LOSS, Seller retains legal tile to the equipment until 80% paid.  In the event it is ever determined by any Court of competent jurisdiction that title has passed to Purchaser, Purchaser does hereby grant to Seller a Purchase Money Security Interest in the equipment until full and final payment is made therefore by Purchaser.  If Seller for any reason does not retain title to the equipment until fully and finally paid Seller shall have the rights of a secured creditor under the Uniform Commercial Code for the jurisdiction applicable to this Sales Agreement.  Purchaser hereby authorizes Seller to sign and file on behalf of Purchaser as the Debtor, any financing statements or other documents with state or local recording offices which may be required to prefect such security interest.

All rights, title and interest to the software and documentation, if any, provided hereunder shall at all times remain with Seller.  Seller hereby grants Purchaser a non-transferable and nonexclusive perpetual license to use all computer software manufactured and provided by

Project:   ASPEN Replacement     Page 17/22        © Kuecker Logistics Group
Omaha, NE



Proposal 8715JK
May 9, 2018



Seller under this Agreement at the site of the Work.  Purchaser agrees to use such software strictly in compliance with the terms of this Agreement, and for the use(s) contemplated herein.  Even though Purchaser does not become an owner of a copy of the software until it receives title to the Equipment, Seller grants permission for Purchaser to exercise the rights of an owner as set forth in 17 USC 117, that is, to make archival or backup copies of the software, to adapt it as necessary for it to run on the Equipment for which it is licensed, and to run it as an aid in maintaining the Equipment, Purchaser specifically agrees not to copy the software for any purpose other than those set forth in 17 USC 117, not to utilize it at any other site, and not to furnish, disclose, or otherwise make said software, or any portion thereof, available to any third party.  Any action by Purchaser in contravention of this provision shall constitute a breach of this contract entitling Seller to the return of the software and any and all copies thereof.  Purchaser hereby acknowledges that Seller shall have the right to specific enforcement of the terms of this provision.

### 6.4.2.16   Article 16 Drawings and Specifications:

Specifications of this proposal and accompanying drawings are the Seller's property, loaned to Purchaser for record and information purposes only and are subject to recall at any time prior to our final approval of this Sales Agreement.

### 6.4.2.17   Article 17 Delayed Payments:

In the event that Purchaser fails to make due and punctual payments for the Equipment and/or Work as provided herein, interest shall accrue on the amount due and unpaid at the rate of one percent (1%) per month for each full calendar month or part thereof during which such amount shall be outstanding, such interest to commence to accrue on the fifteenth (15th) day after such amount is due and payable hereunder.  If the interest rate provided herein exceeds the maximum interest rate permitted by law, then the interest payable shall be at such maximum permissible rate.

### 6.4.2.18   Article 18 Contingencies:

In the event of any condition or contingency, existing or future, which is beyond the reasonable control and without the fault or negligence of Seller ("Event of Force Majeure") which prevents or delays, or materially increases the cost of, the performance by Seller of this Sales Agreement, Seller shall be entitled to an appropriate extension of time for performance of this Sales Agreement and an equitable adjustment in the Purchase Price. Events of Force Majeure shall include, without limitation, acts of God, explosions, fire, floods, transport delays, strikes, insurrection, labor disputes and interference by civil or military authorities.  If an Event of Force Majeure occurs, Seller shall take measures to mitigate and minimize the effect of such Event and to continue with the performance of its obligations under this Sales Agreement.

Project:  ASPEN Replacement      Page 18/22      © Kuecker Logistics Group
Omaha, NE



**Proposal 8715JK**
**May 9, 2018**



### 6.4.2.19 Article 19 Cancellation:

(a) This Sales Agreement may be canceled upon the occurrence of any of the following events:

(1) In the event that either party shall breach or fail to comply with any provisions of this Sales Agreement and such breach or failure shall continue for a period of thirty (30) days after the giving of written notice thereof by the other party, the other party may cancel this Sales Agreement immediately upon the giving of notice thereof to the defaulting party.

(2) Notwithstanding the foregoing, if Purchaser shall have failed to make any payment due under this Sales Agreement within thirty (30) days after having been so notified in writing by Seller, Seller may cancel this Sales Agreement immediately after the expiration of the thirty (30) day period by giving notice of such cancellation to Purchaser.

(b) In the event of any cancellation of this Sales Agreement by Seller for default on Purchaser's part in the payment of any portion of the Purchase Price hereunder, Seller shall have all the rights and remedies afforded by the laws of Kansas.

The rights and remedies referred to in this Article are cumulative, and Seller shall not be required to make an election at any time. Seller shall be entitled to assert its claim of a mechanic's lien against the Equipment and the property upon which it is erected at any time before the expiration of the time fixed by law for filing such lien.

(c) In the event of any cancellation of this Sales Agreement, Purchaser shall nevertheless be obligated to pay Seller an amount equal to Seller's actual cost of performance plus a reasonable profit hereunder up to the effective time of the cancellation.

(d) Except as set forth above, this Sales Agreement shall not be subject to cancellation by either party after the date of execution hereof.

### 6.4.2.20 Article 20 Warranty:

The Seller will assign any manufacturer's warranty to Purchaser. Seller shall perform all workmanship in a workmanlike manner.

THERE ARE NO OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OTHER THAN AS SPECIFICALLY SET FORTH HEREIN.

### 6.4.2.21 Article 21 Use of Installed Portions of the Equipment:

Whenever, as determined by Seller, the installation of any portion of the Equipment has been completed, Seller may make available such portion for Purchaser's use, provided, however, that Seller and Purchaser shall mutually agree on the terms and conditions of



**Proposal 8715JK**
**May 9, 2018**



such use.  Except as otherwise agreed by Seller and Purchaser (including where appropriate, an adjustment in the Purchase Price and/or schedule otherwise provided for in this Sales Agreement), such use shall not interfere with the installation of the remainder of the Equipment.  Seller shall not be liable for the cost of repairs, rework or replacement which may be required due to ordinary wear and tear resulting from such use.

### 6.4.2.22   Article 22 Insurance by Seller:

Seller will maintain insurance coverage covering its operation as follows:
Comprehensive General Liability - $1,000,000 per occurrence, $ 2,000,000.00 general aggregate

Personal Injury Liability - $1,000,000 Limit.
Umbrella - $4,000,000 per occurrence, aggregate $4,000,000
Business Auto - Bodily Injury & Property Damage - $1,000,000 Combined Single Limit.
Worker's Compensation - Statutory - Employer's Liability; $500,000 each accident; $500,000 each employee; $500,000 Policy Limit

### 6.4.2.23   Article 23 Limitation of Liability:

Notwithstanding any other provision of this Sales Agreement, EXCEPT THE WARRANTY PROVISIONS, Seller shall not be liable to Purchaser or anyone claiming through Purchaser (a) for any special, indirect, incidental or consequential damages of any kind whatsoever, whether such damages arise out of the use, inability to use, failure of, defects in, the Equipment or otherwise, or (b) for any charges or expenses of any nature incurred without Seller's written consent.

### 6.4.2.24   Article 24 Indemnification:

To the fullest permitted by law, the Contractor (Kuecker) shall indemnify and hold harmless Greater Omaha Packing from and against all claims, damages, losses and expenses, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor or anyone directly employed by it.

### 6.4.2.25   Article 25 Waiver:

Except as otherwise expressly provided in this Sales Agreement, no failure on the part of either party to exercise, and no delay in exercising, any right, privilege, or power under this Sales Agreement shall operate as a waiver or relinquishment thereof; nor shall any single or partial exercise by either party of any right, privilege or power under this Sales Agreement preclude any other or further exercise thereof, or the exercise of any other right, privilege or power.  Waiver of any party of any breach of any provision of this Sales Agreement shall not constitute or be construed as a continuing waiver, or as a waiver of any other breach of any provision of this Sales Agreement.

Project:  ASPEN Replacement      Page 20/22         © Kuecker Logistics Group
Omaha, NE



**Proposal 8715JK**
**May 9, 2018**



### 6.4.2.26  Article 26 Entire Agreement:

This instrument, together with any attachments specifically made a part of this agreement and any other documents incorporated in such attachments by reference, embodies the whole agreement of the parties relating to the subject matter of this Sales Agreement and supersedes any and all prior oral or written specifications, communications and agreements by or on behalf of the parties. This Sales Agreement may not be varied by any purchase order, acknowledgment, confirmation, invoice, or shipping document issued by either party. Any amendments or modifications of this Sales Agreement must be in writing and signed by purchaser and an officer of seller to be binding.

### 6.4.2.27  Article 27 Governing Law:

This Sales Agreement shall be governed by and interpreted in accordance with the law of the State of Nebraska.



**Proposal 8715JK**
**May 9, 2018**



APPROVED AND EXECUTED BY:
AUTHORIZED FOR PURCHASE BY:

Greater Omaha Packing

Signature

Name _ANGELO FILE_

Title _EXECUTIVE VICE PRESIDENT_ Date _6/14/18_

AUTHORIZED FOR SELLER BY:

Kuecker Logistics Group, Inc.

Signature

Name _James R. Kuecker_

Title _VP Systems_ Date _6/18/18_

Project:  ASPEN Replacement     Page 22/22     © Kuecker Logistics Group
Omaha, NE

**Addendum to Kuecker Logistics Group (ASPEN Replacement) Proposal (#8715JK dated 5/9/2018)**

Greater Omaha Packing Co. (GOP) is undertaking a major project involving the design, construction and integration of an on-site automated box storage, retrieval and loading system for its fresh products produced at its Omaha, NE beef processing facility. The success of the Facility Box Storage System Project #8214 R6 (Project) will also depend on successfully completing the Floor 2 Project as set forth in Project #8453JK R1 (Floor 2 Project) and providing software and engineering services to add the required functionality to replace portions of GOP's ASPEN software Warehouse functionality as more fully described in the ASPEN Replacement Proposal #8715JK)(Proposal).

To achieve all of the ASPEN Replacement Proposal 's objectives, including specifications, timelines and, ultimately, the full optimization of the integrated material handling system being installed by Kuecker, GOP will rely on Kuecker Logistics Group (KLG) to provide software and engineering services to add the required functionality to replace portions of GOP's ASPEN software and integrate the software into its Warehouse Execution Software (WES) and retire the current ASPEN systems warehouse functions, as more fully described in the Proposal.

The purpose of this Addendum is to clarify any of GOP's expectations that may not be fully stated in the Proposal and for the parties to agree to establish a dispute resolution process should any disagreement arise that is not resolved by mutual agreement. Specifically:

- KLG acknowledges that GOP is relying on KLG to design and integrate the ASPEN software functionality into the New Automated Box Storage System as described in Sections 2 and 3 of the Proposal and that the reference to the New Automated Box Storage System includes the KeyChain WES software.
- KLG shall coordinate the completion and implementation of the ASPEN Replacement Proposal with the implementation of the KeyChain WES software.
- KLG shall coordinate the completion of the ASPEN Replacement Proposal and the Floor 2 Project with the delivery/hand over date as referenced in Section 6.1 of the original Project Agreement, which date shall be as soon as is practicable, but no sooner than the date all systems and technologies function as described in Section 4 of the original Project Agreement.
- KLG agrees that this Addendum shall be considered as an additional contract document as referenced in Section 6.4.1 of the Proposal.
- KLG and GOP agree that any dispute over the terms of the ASPEN Replacement Proposal that is not resolved by mutual agreement shall be submitted to a single arbitrator in Douglas County, Nebraska and be resolved by binding arbitration before such arbitrator in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and that judgment upon the award rendered by the arbitrator may be entered in Douglas County District Court.

Approved and Executed on behalf of GOP by Angelo Fili, Executive Vice President:

_____  6/14/18  (signature and date)

Approved and Executed on behalf of KLG by Jim Kuecker, VP System Sales:

_____  6/18/18  (signature and date)